NAIHAUS et al. v. FEIGON.

No. 12299.

Court of Civil Appeals of Texas.
Galveston.

Nov. 8, 1951.

Rehearing Denied Dec. 6, 1951.

---

Cole, Patterson, Cole & McDaniel, Houston and Armstrong, Barker, Bedford & Lambdin, Galveston (Bennett B. Patterson, Richard R. Cole and Owen D. Barker, Galveston, of counsel), for appellants.

Markwell & Stubbs and Russel H. Markwell, all of Galveston (Harold M. Oster, of Dallas, and Ralph Crawford of Galveston, of counsel), for appellee.

CODY, Justice.

This is a contest of the will of Mrs. Annie Reiman, who died in Galveston on September 14, 1949, which originated in the County Court of Galveston County. The contestants are nieces, grand-nieces, nephews and grand-nephews and the proponent of the will, the contestee, is Louis Feigon, who is named as the principal beneficiary and

is independent executor. He was not related to the testatrix. From the judgment of the County Court, ordering the will probated, contestants appealed to the District Court, where, at the conclusion of all of the evidence, the court directed the jury to return a verdict for the contestee and rendered judgment directing the will to be probated.

On this appeal the contestants have abandoned lack of testamentary capacity as a ground of an attack on the validity of the will and here confine the attack to two grounds, (1) undue influence and (2) that the testatrix did not have full knowledge of the contents of the will. Therefore, the burden was on the contestants to make out a case to go to the jury on these grounds. Since the court in effect sustained a demurrer to contestants' evidence, the evidence offered in support of said grounds must be taken as true and all inferences favorable to contestants which the evidence will reasonably bear must be indulged.

Before stating the evidence in conformity with the test just stated and in order to properly evaluate such evidence, we call attention to the case of Long v. Long, 133 Tex. 96, 125 S.W.2d 1034, 1035, which announces certain general grounds which govern in undue influence cases. There it is stated that the influence is not undue " * * * unless the free agency of the testator has been destroyed, and a will produced that such testator did not desire to make." It is further there noted that undue influence must generally be established by circumstantial evidence and among the circumstances to be taken into consideration along with others which tend to show that the free agency of the testator has been destroyed is an unnatural disposition of property made by the will.

It is further to be borne in mind that it is only where undue influence has been independently proved that a testator's declarations, acts and course of dealing, expressive of a mental state produced by such influence (whether contemporaneous with the execution of the will or within a reasonable time before or after its execution) are admissible on the question of testator's free agency in executing the will. Scott v. Townsend, 106 Tex. 322, 166 S.W. 1138.

It may be further noted that it has been held that the following enumerated facts standing alone would be insufficient to raise an issue of undue influence though if such facts were shown in combination the issue would be raised: (1) testatory intention of deceased, (2) opportunity afforded to alleged wrongdoer to control the decedent's acts, (3) character and condition of the decedent, (4) activity on the part of the alleged wrongdoer in procuring the execution of the writing, and, (5) naturalness of the provisions of the instrument. Quoted from 44 Tex.Jur. 585, in motion for rehearing in Schelb v. Sparenberg, Tex.Civ.App., 111 S.W.2d 324.

A great volume of evidence, as is usual in undue influence cases, was introduced into the record. We think it would be helpful to arrange the evidence of circumstances in a chronological order.

In 1937 testatrix and her husband both made wills. At that time testatrix devised 75% of her property to her husband and 25% to Y. Reiman, whom she referred to as her son but who was the son of her husband by a prior marriage. Then on April 4, 1939, which was after her husband's death, she made a new will in which she left everything to her aforesaid step-son; then on March 21, 1940, she made a codicil to her 1939 will making certain gifts to Temple B'Nai Israel, of which she was a member, the congregation of which adhered to Reform Judaism.

Later in the same year (1940) testatrix made a new will in which she again made her step-son her principal beneficiary but in this will she left $2,000 to ten various nephews and nieces in Poland, and again left certain gifts to her synagogue. Thereafter, in 1943, and which was after the death of her aforesaid step-son and many of her nephews and nieces to whom the $2,000 bequest was left in the 1940 will, testatrix made a new will. In this 1943 will she left $500 to the Beth Jacob Synagogue of Galveston, which subscribes to Orthodox Judaism, and $500 to Temple B'Nai Israel.

In this 1943 will she devised $300 to an institution for the blind and left her jewelry to three nieces who resided in New Orleans, being Annie Naihaus, Gertie Silver and Mollie Pianko. In this 1943 will she made her friend and attorney, Alfred Borofsky, who was not related to her, her residuary legatee. Mr. Borofsky died January 28 or 29, 1948.

Two days after the funeral of Mr. Borofsky testatrix went to the law office of Mr. Crawford in Galveston and told him that she would now have to write a new will and would come back later to give him directions. No one accompanied testatrix at that time. Mr. Crawford was the law partner of Mr. Borofsky at the time of Mr. Borofsky's death. Before they formed their partnership Mr. Crawford had been the County Attorney of Galveston County and Mr. Borofsky was an assistant County Attorney.

Then about February 22, 1948, testatrix came back to see Mr. Crawford at his office. Mr. Feigon had arrived at Mr. Crawford's office some five minutes before testatrix did and waited in the outer office until she arrived. At this point, we digress to say that Mr. Feigon, contestee, was the Rabbi of Beth Jacob Synagogue and had been such for more than twenty years. The evidence was to the effect that testatrix had telephoned Mr. Feigon to meet her at Mr. Crawford's law office without telling him for what purpose.

Upon the arrival of testatrix she and the contestee went into Mr. Crawford's office and there the testatrix, in the presence of contestee told Mr. Crawford she would have to make some changes in her will (the Borofsky will). Mr. Crawford then took that will and read each of its paragraphs to the testatrix, asking her with respect to each such paragraph how she wanted it changed. She raised the amount of the bequest to each of the synagogues from $500 to $1,000. When asked about what change she wanted in the residuary paragraph of the old will (Borofsky will), testatrix told Mr. Crawford she wanted to leave everything to Rabbi Feigon. We digress here to say that Mr. Crawford testified that Mr. Feigon appeared to be surprised. Mr. Feigon's testimony was that he had no fore-

knowledge of testatrix' intention to make him a legatee—returning to the narrative of the circumstances—when Mrs. Reiman was asked with respect to the executor (Mr. Borofsky had been the executor in the old Borofsky will), Mrs. Reiman asked if the executor had to be a lawyer and was told by Mr. Crawford that he did not and that Rabbi Feigon could be executor. Mrs. Reiman then said, "If it is all right and he can be executor, why let him put his name in." Except as to the changes referred to, testatrix instructed that the will be otherwise the same as the old will.

Three or four days after this conference with Mr. Crawford and after the new will had been drafted, testatrix returned accompanied by contestee. Mr. Crawford read the will as he had drafted it to testatrix, in the presence of contestee and upon her indicating that it was what she wanted, she signed it in Mr. Crawford's office and the will was witnessed by Mr. Crawford and his secretary. Mr. Crawford handed the will to the contestee, who put it in his pocket.

According to contestants' evidence, which is here binding, testatrix was a septuagenarian at the time she executed the will in question. She spoke broken English and except that she could laboriously sign her name she was unable to read or write in any language and letters to her were read by a friend and neighbor, and letters by her were so written. Testatrix did not understand the meaning of words not in common use and would frequently misunderstand what was read to her unless it was carefully explained. This applied even to newspapers which were read to her. She could not have known of her own knowledge the meaning of legal terms used in legal instruments such as deeds and wills which she had executed. At the time Mr. Crawford prepared the will he knew of course the testatrix only spoke broken English but did not know that she was completely illiterate.

It was undisputed, however, that with the exception of collecting her rents testatrix managed her affairs, including insurance matters, contracts for repairs of her property and saw to it that these repairs were

made as contracted for. After the date of the execution of the will here in question she made a sale of a piece of real estate belonging to her for $38,500, which was an advantageous sale for her. Among the checks which testatrix gave after she executed the will in connection with running her affairs was one for $10,000 and another for $5,000. It was not disputed that she was an able business woman.

On the date that Mrs. Reiman executed her will she told her friend and neighbor, Mrs. Paretti, (who read letters to her and wrote letters for her and read the newspaper to her) that she had left her property to charity and to her folks. Mrs. Reiman told other near friends that she left or intended to leave her property to charity and to her nieces and nephews. The only person Mrs. Reiman told that she had left her property to Rabbi Feigon was Mr. Boddeker, the man who collected her rents. Mrs. Reiman consulted Hon. Jules Damiani and told him she wanted him to draw her will about a dozen times within three months prior to her death. When testatrix' kin in New Orleans wanted her to move over to New Orleans after she became ill, she consulted Mr. Feigon and he advised against it. Mr. Crawford also, whom she consulted, advised against it.

The evidence shows that Mr. Crawford accepted employment adverse to Mrs. Reiman between the time he drew her will and the time he drew the codicil to the will.

Contestants' evidence was to the effect that some three years before the will was executed testatrix was in a hospital, at which time contestee visited her and thereafter, according to contestee's evidence, he would visit in her home every day.

The evidence further shows that after she had a heart attack and was confined to the bed in what proved to be her death bed, Mr. Crawford was summoned to prepare a codicil to the will and was notified that one of the three nieces who lived in New Orleans and to whom testatrix had devised her jewelry had died and to prepare a codicil which would devise to the surviving nieces named in her said will and who lived in New Orleans, testatrix' said jewelry. This was on the 12th of September; and Mr. Crawford prepared the codicil, carried it out to testatrix to have it executed, which testatrix did and it was witnessed by Mr. Crawford and his then secretary.

The same day that the codicil was executed testatrix died.

■ We agree with the learned trial judge that there was here no affirmative probative evidence of undue influence. The evidence that testatrix told her neighbor, after she returned from Mr. Crawford's office, that she had left her property to her folks and to charity was admitted on the issue of undue influence only for the sake of whatever light it might shed on the question of her free agency in executing the will.

■ Contestants strongly urge that the provisions of the will under consideration are unnatural. It is idle to argue from cases which hold that a testator is under a moral or natural obligation to leave his property to his lineal ascendants or descendants, that he is also under such an obligation to provide for his collateral heirs. We have found no Texas case after investigation, and believe none can be found, where a will has been held to be unnatural where only the claims of collateral kin have been disappointed.

The kin who resided nearest to Galveston, lived in New Orleans. These seem to be the only relatives with whom she came into personal contact. Their evidence was that testatrix was cordial and loving with them. She left her jewelry to three of them, who were her nieces. We fail to see anything unnatural in her failure to make her New Orleans kin her principal legatees, and there is nothing unnatural in the failure of the testatrix to leave property to her collateral kin who were not personally known to her.

There was no evidence from which it could be reasonably inferred that Mr. Feigon was active in procuring the execution of the will. The occasion to make a new will arose when Mr. Borofsky died. The evidence shows that she herself went to Mr. Borofsky's law partner to notify him that she would have to make a new will.

The evidence was to the effect that the first that contestee knew that she was going to make a will was at her attorney's office, and the first he knew he was to be a legatee was when he heard her so state to her attorney.

Testatrix was in her seventies, but she was actively conducting her business affairs at the time she executed her will, and thereafter until the time of her death. There was no evidence of probative value with reference to her character or condition from which it could be inferred that the will in question was the result of undue influence. There was evidence that upon the day she made her will she told her neighbor and intimate friend that she had left her property to her folks and to charity. She had left some property to her folks and to charity, and at best such statement of how she left her property when she had "folks" in New York and foreign countries is not a very clear statement of how she disposed of her property. She was bound to have known, from her instructions to Mr. Crawford, that she had in substance substituted Mr. Feigon in the new will in the place of Mr. Borofsky.

 According to contestants' evidence, Mr. Feigon visited testatrix every day for more than three years before her death. He certainly had the opportunity to ask testatrix to leave him her property. But the only thing in their relationship which could support an inference that he had the opportunity to control testatrix' acts was the fact that he was the Rabbi of a congregation to which she did not belong. Even though testatrix did not belong to contestee's congregation, we think that under the evidence the inference could legitimately be drawn that Mr. Feigon was a spiritual adviser to her. But the fact that he sustained a confidential relationship to her would not raise the issue that the will in question was the result of undue influence.

We hold that the issue of undue influence was not raised.

We also hold that the evidence was insufficient to raise the issue that testatrix did not fully know the contents of her will. Laymen as a rule do not understand the technical and legal language of deeds and wills, whether they are literate or illiterate. We hold that the evidence was insufficient to raise issue that testatrix might have thought that she was leaving her property to charity, to be administered by contestee.

Contestants complain that the court admitted evidence that Mr. Feigon visited the sick and lonely of all faiths, of whom he had knowledge. Evidence by pastors of certain Christian churches was admitted. We are not certain that evidence of this character, designed to show that Mr. Feigon's relation to testatrix did not differ from his relation to others, may not have been admissible as a part of the circumstances of their relationship. Of course, if the evidence was offered merely to show that he was a good man who would not do wrong, it would not have been admissible. But since we hold that there was no evidence of probative force to support the grounds upon which the validity of the will was attacked, the court rendered the only judgment which could have been rendered.

Judgment affirmed.