In the Matter of the ESTATE of Rebecca
Estes GRAY, Deceased.

No. 5086.

Court of Civil Appeals of Texas.

El Paso.

April 13, 1955.

Rehearing Denied May 4, 1955.

William D. Kimbrough, John J. Watts, Odessa, R. B. Rawlins, Robert C. Ziesenheim, Monahans, Henry Russell, Pecos, Ed. M. Whitaker, Midland, Abner S. Lipscomb, El Paso, for appellants.

Thornton Hardie, Jr., William L. Kerr, Midland, T. H. Neel, Alton C. Linne, Monahans, Carl S. Springer (of McMahon, Springer, Smart & Walter), Abilene, for appellees.

FRASER, Justice.

This is a will contest case and arose in the following manner: On September 13, 1952, John P. Butler and Wm. L. Kerr filed application for the probate of the will of Rebecca Estes Gray in the County Court of Ward County, Texas. Mrs. Gray had died on September 11th of the same year, leaving a written will in which the petitioners were appointed executors. Appellants, who were contestants below, and who will so be referred to hereafter in this opinion, filed contest to the admission to probate of the will and codicil. The contestants appealed from the order of the Probate Court admitting the will to probate, and the first trial in the District Court thereon in Ward County resulted in a hung jury. The second trial, upon which this appeal is predicated, resulted in the entry of judgment admitting the will to probate, and the appeal to this court was duly perfected thereupon.

There were only two issues submitted to the jury, one inquiring as to the soundness of testatrix' mind at the time she executed the will on June 12, 1951, and the other issue making the same inquiry as to the soundness of her mind when she executed the codicil on August 9, 1952. The jury answered both issues in the affirmative, stating in each case:

"She was of sound mind."

The testatrix was approximately sixty years of age when she executed the will offered, and sixty-two years of age when she died. She was stricken with her last illness in May, 1952, was transported to Hotel Dieu hospital in El Paso, Texas, where she passed away September 11, 1952. Mrs. Gray died possessed of a considerable estate, running into the hundreds of thousands of dollars at the very least. At the time of her death she had no living relatives except those who were descendants of deceased brothers and sisters of her deceased maternal and paternal grandparents. She had been married and divorced, with no children born or adopted. Her father and mother and brothers had preceded her

in death, her last brother having died October, 1949. Some eight days after the death of her brother, leaving her the last of the family, she executed a will in the office of her attorney at Midland, Texas. This will, after providing for place of burial and payment of debts, and bequests for the upkeep of cemeteries at Monahans and Midland, and a bequest to a Mrs. Farr, then provided for the equal distribution of the residuary estate between four Methodist institutions:

McMurry College, Abilene, Texas,

Texas Weslyan College, Fort Worth, Texas,

Methodist Home, (a home for children) Waco, Texas,

C. C. Young Memorial Home, (for elderly ladies) Dallas, Texas.

and then closed with the appointment of proponents as executors, granting them authority as such and providing against any court action except probating of the will. This will of 1949 was supplanted by a later will executed June 12, 1951. The 1951 will was substantially the same as the prior will, excepting that it provides for the payment of certain church pledges, bequeathed a Limestone County farm to a Methodist home that had been using the same, otherwise the will was substantially the same as the 1949 will. On August 9, 1952, approximately a month before her death, testatrix executed a codicil to the 1951 will. She did this in the hospital with the assistance of her Midland attorney, and same was executed in the presence of witnesses who were apparently employees of the hospital. This codicil added to the bequest to Mr. and Mrs. Farr, and added a bequest to Mrs. Pritchett (later a contestant) and to Miss Lovie Neill; provided that the bequests be observed before the residuary estate be distributed, then reaffirmed her 1951 will as modified by this codicil.

The contention is against the bequests to the four institutions, there being no attack made on the other provisions of the will or bequests. The entire will, or rather, the making of same, was under attack by contestants; however, the matter of undue influence was directed only at the residuary bequests to the four Methodist institutions. The court refused to submit the issue of undue influence to the jury.

A total of fifty witnesses testified in the trial of the case. There were, according to the transcript, some thirty contestants. Both sides were represented by numerous and able counsel, the record revealing as a matter of fact that nine different attorneys addressed the jury. The case has been ably and thoroughly briefed by both sides. Needless to say, the record is voluminous, but the nature of this case has demanded and received our very careful examination of the entire record in order to determine the issues herein raised. Appellant has raised some twenty-seven points of error, which we will undertake to take up with respect to the manner of their briefing and the order of their presentation.

■ Appellants' first point complains of the trial court's refusal to admit certain testimony from witness Dr. W. D. Black to the effect that Mrs. Jane Estes, mother of testatrix, was a domineering type of person. Examination of the record reveals that witness Dr. Black had lived in West Texas for many years and had visited with the Estes family. Objection was made to the question regarding the personality of testatrix' mother and was sustained both as to question and answer. We believe the objection was good in that such testimony was of necessity remote, because the will was made in 1951 and the mother had died in 1946. Dr. Black stated that he did not think testatrix was insane, but felt she had written a foolish will. The excluded testimony, taken at its best, did not sufficiently suggest lack of mentality on the part of testatrix, nor undue influence that would subvert her will and natural desires, and continue to do so until she executed her will. A domineering personality, absent any more proof of actual instances or definite element of substituting the will of the dominor for that of the other person will not of itself constitute undue influence. Domination must be complete and successful, and such must be clearly suggested.

Be that as it may, the record shows that in other parts of the witness's testimony the doctor was permitted to say substantially the same thing in that he gave instances that to him evidenced the mother's domination. So the exclusion, if improper, would present no error, as while his answer that she was a domineering type was stricken, he was allowed to give several instances which he thought indicated that the mother was a domineering type. It must be remembered, in any event, that it is the condition of testatrix' mind at the time of the actual execution of the will that is of prime importance, and here the mother had been dead some five years before this will was executed. This point is overruled. Helsey v. Moss, 52 Tex.Civ.App. 57, 113 S.W. 599, wr. ref.; Burgess v. Sylvester, Tex. Civ.App., 177 S.W.2d 271, affirmed 143 Tex. 25, 182 S.W.2d 358; Navarro v. Garcia, Tex.Civ.App., 172 S.W. 723; 57 Am. Jur. p. 106.

■ Point No. 2 complains of the exclusion of the testimony of one Reeder Webb. The record reveals that Mr. Webb had not seen testatrix since 1940. Again it is thought that this testimony, if so offered, would have been too remote to have been of any proper value to the jury. It is a well known rule that even people of admitted unsound mind may have lucid intervals, and in such lucid interval be possessed of testamentary capacity, so again it must be remembered that it is the testatrix' mental condition at the time of executing the will that is of primary importance. This point is overruled. Bell v. Bell, Tex.Civ.App., 248 S.W.2d 978, w. r. n. r. e.

■ Appellants' third point is based on the exclusion of the opinion of one Jack Lewis, who was asked the question if he had noticed any difference in the memory of testatrix during his conversation with her in 1949. He later stated without objection that her memory did seem to him defective, and not like it had been earlier. On cross examination he stated that because she had twice asked him in this conversation, when had he been by the ranch,

he reached the conclusion that something was wrong with her, and that that was the only thing unusual that he remembered about the conversation. Examination of the record indicates that this proffered opinion of a non-expert witness was correctly excluded, as it appears that witness saw testatrix only the one time from 1939 until her death, and that the 1939 visit was simply that of seeing her at the house with the rest of the family as he passed by on a Christmas day. Prior to that time he had not seen testatrix since approximately 1928. We do not think a proper background or predicate had been laid to permit this witness to give an opinion as to the mental capacity of testatrix. In any event, he was permitted to relate the instances he thought were strange, so that the jury had the benefit of that information and only his opinion was excluded. This point is overruled.

■ Appellants' fourth point complains of the exclusion of the testimony and opinion of testatrix' former husband. This witness was separated from testatrix in 1942 and saw testatrix on two occasions thereafter, but only talked to her on one occasion, which was in 1946. Again we are faced with the fact that his testimony, which would have been to the effect that in his opinion testatrix did not have testamentary capacity and had no real business sense, and that his mother-in-law had broken up his marriage and caused testatrix to be worried and dominated was remote. All of this testimony, of course, related to instances and observations prior to their separation in 1942, so he had no real knowledge of testatrix' mental condition for approximately nine years before the execution of the will. However, it must be noticed that the record reveals that testatrix did not seek the divorce from this witness until 1947, which was after her mother's death. We must agree with the trial court that this testimony was too remote to be of proper value and was therefore properly excluded, and so this point must also be overruled.

Appellants' fifth point complains of the court's action in excluding certain testi-

mony of Dr. Black involving some three questions. The first question asked whether or not testatrix had any ability to transact business, and the doctor's answer was "I think she did." The second question inquired as to whether her mentality was sufficient to understand the nature, value and extent of her estate, and the doctor's answer was: "Definitely not, I don't think she did." The statement of facts on pages 157 and 158 indicates that these matters were both admitted in evidence. Contestants' brief points out that on page 181 of the statement of facts there is a reporter's note which says:

"The following pages from 181 to 183 were not admitted to the jury, and are shown for contestants' bill of exceptions."

On those pages we find the same questions repeated. So far as we can tell, this much of the testimony was admitted in evidence according to the statement of facts, which shows on page 155 a statement of the court reporter, to-wit:

"The jury comes into the court room. The court then said: 'Are you ready, gentlemen?'"

After the first question there appears in parentheses:

"Deposition was read from the above question to the following:"

Some questions and answers then appear with various objections, and then the questions are asked on pages 157 and 158, and so far as we can tell were answered in the presence of the jury. The third question and answer was objected to on the ground that the answer was not responsible. The question was:

"Do you feel that her mentality was such that she could understand the natural objects and bounties of her estate, and discharge her duties toward that relationship?"

*The objection to the question was overruled,* and witness answered as follows:

"John, we would have to answer that this way: It is evident by the fact that what she did with what she had, and if she had been fair and just, as I think she would have been if she had known just exactly what that meant to all her relatives and all concerned, she would have made a different will, and I guess I shouldn't say this, I will leave that unsaid, getting along well with her family and relatives, that doesn't enter into it."

We think the court was within his rights in instructing the jury to disregard the *answer* as being not responsive. The record shows that counsel then went into lengthy arguments and discussions and the witness *was never asked the same question again,* and so the answer remains stricken. In view of what had been permitted in the other two questions and the unresponsiveness of this answer, we do not find error in the court's ruling, and accordingly overrule this point.

Now it must be observed with reference to the preceding points and the matters involved therein that it is a matter of law as to whether or not a lay witness has qualified himself so as to testify and give opinions as to lack of sanity of a testator. Here the court ruled that the witnesses involved had not had enough contact and observation to so qualify, and excluded their opinions on such grounds and for the further reason of remoteness in time. It has been difficult to pass on this matter as part of the testimony was taken from depositions read at the former trial. It must be borne in mind in considering these and other points that a testator has the right to dispose of his property as he sees fit, because after all it is his property. Green v. Dickson, Tex.Civ.App., 208 S.W.2d 119; Whitney v. Murrie, Tex.Civ.App., 264 S.W. 270; Milner v. Sims, Tex.Civ.App., 171 S.W. 784. Much has been said about contestants being the natural objects of testatrix' bounty, but we have found no case that goes far enough to make this classification. The record shows that testatrix had only been acquainted with five of the

entire thirty contestants. In the absence of any proof in this record, it is difficult to conceive how testatrix could have very easily known very much about the existence or identity of the descendants of dead brothers and sisters of her deceased grandparents. So we do not have here a will that is either unnatural on its face or unnatural upon examination. We do not feel, therefore, that the matters complained of above constitute errors.

Appellants' sixth point complains of the exclusion of proffered testimony of Reeder Webb. We feel that this matter has already been disposed of in our discussion of point 2, on the ground of remoteness. This point is overruled.

Appellants' seventh and eighth points refer to the excluded opinion of Jack Lewis. This matter has also been discussed for the reason that witness could not and did not qualify himself so as to justify an opinion as to the mental capacity of testatrix, having seen her only twice since 1928, and qualified his answer as pointed out in our discussion of point three. These points are therefore overruled.

■ Appellants' ninth point complains of the court's action in excluding the question asked of witness Dr. James A. Brown:

"Do you think that she would be capable of exercising her obligations toward the natural bounties of her affection; such as, her remaining living relatives and their claims upon her?"

The court sustained objection to this question on the ground that it assumed that the natural objects of her bounty were these relatives. We think there is no error in this ruling, as the question uses the term "such as her remaining living relatives" and it does seem to assume that they would be the natural bounties of her affections. Again we think that the remoteness of relationship between contestants and testatrix was so great that they did not qualify as natural bounties of her affections merely because of this relationship. The cases seem to hold that cousins are not normally

or necessarily natural objects of bounty of a testator. The record does not show what the answer would have been. Naihaus v. Feigon, Tex.Civ.App., 244 S.W.2d 325, w. r. n. r. e.; Rudersdorf v. Bowers, Tex. Civ.App., 112 S.W.2d 784, writ dismissed.

Appellants' point 10 complains of the court's action in instructing the jury to disregard and consider for no purpose the answer of witness Dr. Brown, which answer was:

"Q. Now, doctor, if you would assume that a person whom I have described in asking your assumption could keep an estate of her size together for a period of three years, would know the nature and extent of her estate? A. Yes. She would know the nature and extent of her property if she didn't have any assistance in looking after it. But if she knew the nature and extent of her property, I doubt if she would have used newspapers for coverings for her windows."

The answer was objected to as being not responsive, and we think the court was correct in ruling out the voluntary statement of the doctor. This point is overruled.

■ Appellants' point eleven complains of the court's action in excluding the following testimony from witness Mrs. Richardson:

"Q. Do you think she had enough business ability and enough mental capacity to write a will according to a fixed purpose of her own? A. Oh, certainly not."

On objection the court excluded the question and answer, and instructed the jury not to consider same on the ground that the question called for an opinion as a matter of law. This was apparent. Witness could not testify in such a manner as it called for a legal conclusion as to her ability to write a will, especially one that would carry out a fixed purpose. This point is overruled. Taylor v. Taylor, Tex.Civ.App., 272 S.W.2d 636, w. r. n. r. e.; McCormick

& Ray, Texas Law of Evidence, p. 806; Brown v. Mitchell, 88 Tex. 350, 31 S.W. 621, 36 L.R.A. 64.

Appellants' twelfth point complains of the exclusion of the proffered opinion of witness E. W. Owens. Again, this testimony was so remote in time as to be inadmissible. Only the opinion was excluded, and not the evidence. The record is not entirely clear as to the actual time of the transactions in Mr. Owens' jewelry store, but they were not less than six and possibly fifteen years before the execution of the will, and were in themselves confined to her visits regarding some repairs to jewelry. This point is overruled. Navarro v. Garcia, Tex.Civ.App., 172 S.W. 723.

Appellants' thirteenth point is waived.

Appellants' fourteenth point objects to the admission of Exhibit 37, which was a cover and inside page of a Monahans Eastern Star booklet containing a picture of testatrix. The witness Lovie Neill testified that it was, in her opinion, a recent picture. Examination of the exhibit does not reveal any error in permitting the jury to examine it. The writing is innocuous, merely pointing out the fact that testatrix was on a committee. There is some doubt that the actual admission of this booklet was objected to, as one of the attorneys for contestants objected during the examination of Miss Neill as to the type and contents of the book and was overruled. There then appears a reporter's note "The said instrument was marked proponents' Exhibit 37", then comes the objection of the attorney, which went to the answer of witness Neill, which was overruled. This was followed by a further interrogation of Miss Neill, but after several questions and answers the exhibit was offered in evidence by an attorney for proponent, at which time and place there appears no objection. Pictures of testators have been held admissible, and we find nothing in the exhibit to warrant any error in submission. This point is overruled. 20 Amer.Jur. 609; Brownlie v. Brownlie, 357 Ill. 117, 191 N.E. 268, 93 A.L.R. 1041; 57 Am.Jur. p. 105.

Appellants' point fifteen complains of the admission of exhibits 43, 44 and 45. These were form letters apparently sent out by the C. C. Young Memorial Home soliciting help, and providing accommodations for aged mothers. Witness Blanton testified that they were similar to letters sent to Mrs. Gray. We do not see any harm in the admission of these letters. While they are emotional appeals and likely calculated to arouse sympathy in the mind of the recipient, we do not see how their admission here could in any way be prejudicial to contestants. They solicited funds from the living and did not ask or mention the possibility of testamentary bequests or refer to wills in any way. Contestants maintain that these emotional appeals might have a sympathetic effect on the jury. We do not feel that it is a serious probability, as there were three other residuary legatees involved and in any event the witness had been cross examined to a considerable extent by attorneys for contestants on the subject of advertising and form letters. This point is overruled.

Appellants' sixteenth point complains of the cross-examination of contestants' witness Dr. Brown. We have examined the record and do not find merit in this point. Without relating all of the evidence it is clear that attorneys for proponents did conduct a vigorous cross-examination of this witness. There was one question asked, to-wit

"Well, we have a definition of an expert out here and I wanted—"

This followed an inquiry as to how far the doctor was from home. This question, of course, was highly improper and the court properly sustained the objection and instructed the jury to disregard the question, and we feel that that was sufficient to dispose of this improper incident, as it is not felt that it was serious enough or developed enough to have done irreparable injury. The rest of the cross-examination related to witness' employment by one of the attorneys for contestants, and his ability and qualification as a witness, and we do not find

legal error in the questions asked. This point is overruled.

■ Appellants' point seventeen complains of the cross-examination of their witness, a psychiatrist, Dr. Hornisher. Again this was a vigorous and rugged type of cross-examination, but we do not find legal error. And again an improper question was asked. After the doctor had been asked by the attorney for proponents as to his various qualifications, he was asked this question:

"Do you read palms, too?"

While this question was also highly improper, objection was sustained to it and the jury was instructed to disregard the question, and we do not feel the matter is serious enough but what such correction was adequate. We do not find evidence of a mistrial being demanded on the basis of these improper questions.

Appellants' eighteenth point alleges that the court committed error in commenting on the evidence and in refusing to instruct the jury not to consider the same. This matter came about during the cross-examination of contestants' witness Dr. Hornisher. Proponents' counsel had asked witness if he thought anyone who likes over-ripe bananas or over-ripe tomatoes crazy. Contestants' counsel objected on the ground that the evidence tended to show that testatrix bought them not because she liked them but because she couldn't afford the other kind. At this point another member of proponents' counsel asked the court to instruct the jury not to consider counsel's remark. Contestants' counsel then stated that he had the right to make objections. Thereupon the court stated that while he had the right to make objections he had no right to misquote evidence. After some further exchange one of contestants' counsel asked the court to point out wherein he had misquoted evidence, then the following exchange took place:

The Court: "The error, Mr. Watts, was your talking about her making a purchase of some over-ripe fruit or vegetables. The witness who testi-

fied at that time, did not say she saw her make the purchase."

Mr. Watts: "Your honor, Mrs. White—I don't want to say that the court is wrong."

The Court: "I know that the court is not wrong."

Mr. Watts: "I want to say I stand on the record, and I am sure that the court's memory may be better than mine but this is my memory of the record, she happened to be out here in a certain store in town and observed her picking out over-ripe fruit. And that upon questioning her as to why, she said it was because she could not afford the other kind. And I will stand on that, and that was the way we put it in the hypothetical question."

The Court: "I know, but you said she bought it, and she didn't buy it; no evidence she bought it."

Mr. Watts: "I think it is a clear implication."

The Court: "We don't care about implications. We are talking about the facts."

Mr. Watts: "And I want to object to the remark of the court because we say under the circumstances she was selecting and putting it in the basket."

The Court: "Gentlemen of the jury, disregard and consider for no purpose the statement just made by Mr. Watts."

Whereupon the jury was excused for the purpose of making an exception.

We do not find reversible error in this exchange between counsel and the court, nor do we find, as argued in the brief, that the remarks of the court precluded counsel from drawing proper implications from actual evidence during arguments, as alleged in his brief. We do not believe that the court's rulings or remarks should be construed as a comment on the weight of the evidence or that he was in error in his rulings. The incident seems to have

begun with the court's statement informing counsel that he had the right to make an objection but no right to misquote evidence followed by counsel's inquiry as to where and how he had done so. We do not find reversible error in this exchange between the counsel and court, and accordingly overrule this point.

Appellants' point nineteen complains of the court's ruling during the cross-examination of proponents' witness Dr. Ralph Homan. He was asked the following question:

"Now, don't you believe, Doctor, that the proponents in this case, if they want to give the jury some real evidence of probative value, owes it to this jury to bring out a psychiatrist here, or at least a brain surgeon?"

Proponents' counsel objected to this question on the ground that it reflected on their method of handling the case and involved an improper insinuation, and further that such was not within the knowledge of the witness and was the proper prerogative of counsel.

"* * * and as a matter of fact, the way we feel about psychiatrists, I don't imagine we are going to have any."

This exchange between counsel and the court continued with the court finally sustaining objection to the question and to the statement by contestants' counsel that the doctor had already testified that the man best qualified to pass upon the sanity or insanity of an individual was a psychiatrist or neurologist. Counsel for contestants then asked the court to instruct the jury to disregard the statement of proponents' counsel about psychiatrists, to-wit, that due to the fact that feeling the way they did they probably would not call any of them, on the ground that such was a side-bar and inflammatory remark, and in the course of his objection counsel stated:

"It is undisputed that they are the top men in the determination of this matter by even their own witnesses,"

Proponents' counsel then made the following statement:

"If the court please, appealing to the court as a matter of law, your honor of course well knows the court's statement about psychiatrists who testify without ever having seen a patient and how their testimony is to be viewed with suspicion. So as a matter of law, we are entitled to have the jury instructed that these remarks should not be considered for any purpose whatever."

Counsel for contestants then objected to that statement as being improper, and asked the court to instruct the jury not to consider it, as being a side-bar remark, inflammatory, and made for that purpose. This request was refused.

It becomes increasingly difficult in some of these matters involving heated exchanges, to determine the real point at issue, and here we have concluded that the court did not commit reversible error in his ruling. The original question was improper, as being a matter about which the witness could not know, and one on which the witness certainly should not comment. The question and its implications was improper, and any answer thereto would likewise be improper. We think that is the important element of this incident, and that the court in that matter ruled correctly. We do not feel there was anything in the various objections and statements by counsel on both sides that would constitute reversible error, and we therefore overrule this point.

Appellants' points twenty and twenty-one deal with the subject of undue influence, and complain of the court's action in refusing to submit two special issues inquiring whether or not the making of the will and codicil or either was procured by undue influence.

This question has been very thoroughly and ably briefed, and we have given considerable care to its disposition. It is a well accepted rule that as far as this question is concerned the law is settled. It is

the facts that control, and each case must therefore stand or fall on its factual foundation. The court here refused to submit these issues, and took the position that there was no evidence to warrant their submission.

Reviewing the evidence, we find that testatrix during the period of 1946, at which time her mother died, until her own death, apparently lived a fairly full life. The record shows that she made various trips, went to some rodeos and dances, attended some football games, was an active and interested member of the building committee for the Monahans church, and was in attendance at Eastern Star functions. The undue influence charge is levelled only at the residuary legatees. There is no evidence in the record that any of the representatives of the legatees were at or near testatrix at or near the times she executed her will and codicil, and so in the field of opportunity the evidence is of little probative value. The managing head of one of legatees testified that he had never even met testatrix, and yet his institution received a full one-fourth of the residuary bequest. The other three representatives or heads of the residuary legatees testified that they had visited testatrix in her home, and one or two of them had visited her in the hospital. With respect to the hospital visits it must be borne in mind that she made only her codicil there, and it did not change the general provisions of the will, but reaffirmed it and added some bequests. These three witnesses, Dr. Cook, head of McMurry College; Dr. Law Sone, head of Texas Weslyan College, Fort Worth, Texas, and Mr. Johnson, head of the Methodist Home, Waco, Texas, all testified that they had never discussed with testatrix the making of a will or any provision therein, or solicited her in any way to remember their institutions in her will. They categorically denied ever discussing the matter with her, although Dr. Cook testified that he hoped that his institution would be remembered. This testimony has not been contradicted in the record, and the record does seem to indicate that their importunities and solicitations, as far as they went, relate to present donations and contributions and not to any bequest in the will. And so the record is silent as to any direct evidence of any attempted undue influence and we are compelled to conclude that to assign to the actions of these legatees the accusation of undue or attempted undue influence would be to imply that fact upon mere surmise and speculation, or even imagination. It must be further noticed that each legatee received exactly the same bequest, one-fourth of the residuary estate. If undue influence had been present, it is hard to understand why an institution which had made no personal contact with testatrix should receive exactly the same amount as those headed up by vigorous and talented presidents or managers who knew her during her lifetime and visited in her home. It is difficult to conceive undue influence exerted so as to produce the result described.

Had the will in itself been unnatural, the implication might have been easier of achievement, but as has been pointed out, these contestants were extremely distant relatives (third cousins) of testatrix. She was only acquainted with five of them, and only two visited her during the four months she was confined in the hospital in her last illness, and one of these received a legacy of two thousand dollars. We do not believe that relatives so distant in relationship as contestants are "natural objects" of a testator's bounty, solely because of such relationship. Naihaus v. Feigon, Tex.Civ. App., 244 S.W.2d 325; Rudersdorf v. Bowers, Tex.Civ.App., 112 S.W.2d 784. Her original will in 1949 made the same bequests to these legatees; when she made the present will two years later it remained the same, and the codicil a year later affirmed such disposition. The will itself carefully provides for the upkeep of two cemeteries and makes a number of bequests, and the only suggestion that it is unnatural comes from contestants, whose relationship was as described, extremely distant. So here we do not have any close relative disinherited, and we do not find that the will as such is in any way unnatural. (See cases cited in preceding paragraph.)

Another fact to be considered in cases of this type is the physical and mental condition of testator. Here we find in the record that testatrix up until her admission to the hospital, or the illness that led to it, was leading a fairly full and active life. There is no evidence of serious illness or impairment until she broke her leg shortly before she went to the hospital. Some of the witnesses were contestants, who testified in their opinion things she did and said indicated mental deterioration to them. There were many witnesses for proponents, including business associates and next door neighbors, all of whom testified that she was in full possession of her faculties up to and including the times she executed the instruments in question. The doctors who testified as to her mental impairment did so from hypothetical questions and had never seen the patient. Some of the contestants' witnesses did testify that she was retiring and shy and easily influenced, and had been dominated by her mother. On the other hand there is in the record evidence that she herself solicited donations from two of the legatees, for the Monahans church, and received favorable replies. It also appears from the record that she had said her relatives had ignored them when they were poor, and further that she had instructed a tenant that he could not sublease the ranch nor permit any relatives to use any part of it, for fear they might assert some claim. She was sixty years old when she made the will and sixty-two when she died. One evidence of her mentality was found in the fact that while in the hospital in her last illness she remembered that she had forgotten the birthday of one of her close friends, and on their next visit she gave them ten dollars and asked them to go out and have dinner on her. Her attending and treating doctors testified to the clearness of her mind and the condition of her health up to and after she broke her leg in the spring of 1952. And so the evidence does not clearly establish or even satisfactorily suggest that she was aged, infirm, demented, decrepit or in such condition that she would be an easy object of influence. There is no wavering of purpose in her will, starting from 1949; her intention to leave the bulk of the estate to these four institutions was carried out by each succeeding document. She had shown a keen interest in some of the institutions remembered, and had visited them. And so, because opportunity for undue influence seems almost wholly lacking and unproved, because the will itself shows no evidence of being unnatural, but carries out an apparently firmly intrenched and continuing purpose, and because there was no affirmative evidence of undue influence or circumstances properly suggesting same, we hold that the trial court did not commit reversible error in refusing to submit issues dealing with this subject. It would have been surmise and speculation to have held otherwise, and it must be remembered that a testator may do as he wishes with his estate, and that it is not flattery or propaganda, or persuasion or cajolery that constitute undue influence. It is the imposition of one's will on the testator to the extent that testator's will is defeated and he is caused to do that which he did not want to do or would not have done. The cases where such is true are usually found with an aged, infirm individual, who has made an unnatural will. Here the evidence shows a woman doing her own housework and leading an apparently full and active life up until the time she broke her leg. There was a statement related by the son of one of the contestants, who said that one time testatrix said to him that if she had her own way she would leave her property to her relatives. There is no further explanation or circumstances explanatory of the remark, nor is there any date or time given, so we cannot ascribe serious probative force to a remark not shown to be made at any time near the dates of the wills and codicil, or even after her mother's death. In concluding it must be remembered that there are cases holding that cousins are not necessarily "natural objects of a testator's bounty."

We hold, therefore, that there was not evidence of probative force sufficient to raise the issue of undue influence, and these

two points are accordingly overruled. Black v. Black, Tex.Civ.App., 240 S.W.2d 458, w. r. n. r. e.; Pierson v. Pierson, Tex. Civ.App., 57 S.W.2d 633, writ refused; Burgess v. Sylvester, 143 Tex. 25, 182 S.W. 2d 358; Id., Tex.Civ.App., 177 S.W.2d 271; Salinas v. Garcia, Tex.Civ.App., 135 S.W. 588, wr. ref.; Rudersdorf v. Bowers, Tex.Civ.App., 112 S.W.2d 784, writ dismissed; Decker v. Koenig, Tex.Civ.App., 37 S.W.2d 378, writ dismissed; Barksdale v. Dobbins, Tex.Civ.App., 141 S.W.2d 1035; Russell v. Boyles, Tex.Civ.App., 29 S.W. 2d 891; Naihaus v. Feigon, Tex.Civ.App., 244 S.W.2d 325; w. r. n. r. e.

Appellants' twenty-second point complains of the court's refusal to submit appellants' requested definition of "sound mind". We have examined the definition as submitted by the court, and find that the same was proper and adequate, and there was therefore no necessity for submitting another definition of "sound mind". This point is therefore overruled. Rodgers v. Fleming, Tex.Comm.App., 3 S.W.2d 77; Rutherford v. Robbins, Tex.Com.App., 298 S.W. 549; Nass v. Nass, Tex.Civ.App., 224 S.W.2d 280.

■ Appellants' point twenty-three complains of the court's ruling in sustaining proponents' objection to the argument of Abner Lipscomb, one of the attorneys for contestants. Mr. Lipscomb said:

"* * * and gentlemen, the family was not a new relationship. It goes back to almost time immemorial. The cliff dwellers or the cave people had it, it has come on up through the years. And that is when you *wind* your way home Christmas and New Years and holidays and they are the ones there to forgive you and to comfort you in times of trouble. And that's what this woman did. Those are the natural claims of her family. And that's the reason the law says a person to have testamentary capacity must be able to know the natural objects * * *."

This was objected to as follows:

"We are going to object to that argument. There is no such instruction as appearing in the charge which would justify the statement as to the law which counsel makes. Your Honor knows that the natural objects of her bounty has been defined as not including those who are first and second cousins."

We think the court was in error in sustaining objection to the argument of counsel. It will be noted that in the last line and a half counsel says: "the law says" and the part after that seems to us a correct statement of the law. Appellants' twenty-fourth point complains of the court's refusal to instruct the jury to disregard the last two lines of the objection quoted above. We think the court erred in not giving this instruction also, as it is a statement defining natural objects which we cannot find in the court's charge. Although we think the court was in error in these two rulings, we do not think the error sufficiently serious to be reversible or harmful. Ample room was left to counsel to argue the matters for which they contended. Counsel was not prohibited from arguing family relationships as long as he would not describe them as natural objects of her bounty. The statement of proponents' counsel is not considered harmful, however improperly admitted. We therefore overrule points twenty-three and twenty-four.

Appellants' twenty-fifth point complains of the court's ruling in which he sustained objection to the argument of one of the attorneys for contestant. This attorney was commenting on the evidence and argument, and in the course of his argument stated that if testatrix had, as urged by proponents, been of a charitable nature, she would have normally not omitted the county in which she lived, saying:

"Didn't we need a hospital, didn't we need charitable things around this town? Wouldn't it be normal * * *."

We think all things considered that this was a fair comment on the evidence, and that the court was in error in sustaining objection to this argument, as it did tend to apply to the alleged unnaturalness of the will. However, we do not think the error reversible, or productive of sufficient harm to sustain appellants' point thereunder. The jury had heard a great deal of evidence for many days, and were in a position to examine the entire controversy, and we do not feel that preventing counsel from arguing this feature was of sufficient harm to constitute reversible error. Testatrix did provide generously for the Monahans church, cemetery, and certain beneficiaries in Monahans. This point is overruled.

Appellants' twenty-sixth and twenty-seventh points complain of the court's ruling in overruling appellants' objections to arguments of counsel for proponents. We have examined the matters stated under the twenty-sixth point and believe the court's ruling to be correct.

With reference to the twenty-seventh point there are a number of matters mentioned, one being objection made to argument of proponents' counsel wherein he stated things that he had heard specialists talk and lecture about, these two matters being that he had heard them trying to prove that man came from a monkey, and one say something about the jawbone of a jackass that had been dead about twenty years, to prove some issue. These remarks were, of course, improper as being outside of the evidence, but we do not believe constitute reversible error. Had the matter gone much further the reverse might be true as general remarks about specialists in general would not be proper as applying to specialists in particular that had testified. However, we do not consider this incident sufficiently serious to be harmful. There are other matters mentioned in this twenty-seventh point, but the point was not briefed other than a paragraph of the argument under points twenty-three through points twenty-seven. We do not deem it necessary to take up all the other matters mentioned in the paragraph, as we do not find that any of them constituted error, although there were some spirited exchanges between counsel. We feel the jury was able to assess the value of the specialists who were there testifying and to place whatever credence they wished on their testimony, and that the remarks alluded to above would not have been likely to influence the jury in its consideration. This point is therefore overruled.

Summing up, we are confronted with the fact that the jury found testatrix to be possessed of a sound mind at the time she executed the documents in question, and there was ample evidence to support this finding. The further fact is clear that the will as such is not unnatural, in that the record is silent as to any person of close relationship or real claim who was forgotten or disinherited. It must also be admitted that the will and codicil each seem to be carefully prepared, and make definite disposition of her estate and her wishes with regard thereto. The remoteness of relatives who are contestants cannot be overlooked. Nor can we justifiably speculate and surmise that because testatrix left the great bulk of her estate to four religious institutions that she was unduly influenced in so doing. The proof not only states that these men did not ever discuss the matter with her, but in fact did not know of the existence of her will or that anything had been left to their respective institutions, until after her death, when the will was read. There is no evidence that testatrix was the victim of undue influence in any other field, and it would be speculation and surmise to assume that her will had been subverted to that of another into here doing something she actually did not want to do. Undue influence must be established to defeat a will; it must be clearly suggested by circumstances to warrant submission to the jury. Such is not the case here.

Since this opinion was written the case of Boyer v. Pool has appeared, and we now

cite it as further authority for the above matters. Boyer v. Pool, Tex.Sup., 280 S.W.2d 564.

Finding no reversible error, appellants' points are all overruled and the case is affirmed.