ACCEPTED
03-16-00514-CV
12930167
THIRD COURT OF APPEALS
AUSTIN, TEXAS
9/27/2016 3:15:20 PM
JEFFREY D. KYLE
CLERK

**NO. 03-16-00514-CV**

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
9/27/2016 3:15:20 PM
JEFFREY D. KYLE
Clerk

**IN THE COURT OF APPEALS
FOR THE THIRD JUDICIAL DISTRICT OF TEXAS
AT AUSTIN**

OAK CREST MANOR NURSING HOME, LLC, DAY LIFE
CORPORATION, TERRY ROWAN, NORMA ELEMENTO, AND
GROVER MOORE,
Appellants,

v.

PEGGY BARBA, AS GUARDIAN OF S.F.,
Appellee.

On Appeal from the Probate Court,
Travis County, Texas, Cause No. C-1-PB-16-00776

**BRIEF OF APPELLEE**

**Jeff Diamant (Of Counsel)**
State Bar No. 00795319
**John C. Ramsey**
State Bar No. 24027762
**Joel Pardo**
State Bar No. 24083617
RAMSEY LAW GROUP, P.C.
7521 Westview Drive
Houston, TX 77055
Phone: (713) 489-7577
Fax: (888) 858-1452
Email: john@ramseylawpc.com
Email: jeff@ramseylawpc.com
Email: joel@ramseylawpc.com

Jacques G. Balette
MARKS, BALETTE, GEISSEL &
YOUNG, PLLC
State Bar No. 00798004
10000 Memorial Drive, Suite 760
Houston, Texas 77024
Phone: (713) 681-3070
Fax: (713) 681-2811
Email: JacquesB@marksfirm.com

# TABLE OF CONTENTS

RECORD AND APPENDIX REFERENCES .................................................... 2

STATEMENT REGARDING ORAL ARGUMENT ....................................... 2

INTRODUCTION ......................................................................................... 2

ISSUES PRESENTED.................................................................................. 3

STATEMENT OF FACTS............................................................................ 4

SUMMARY OF THE ARGUMENT ............................................................ 8

ARGUMENT................................................................................................ 10

    I.      THE NURSING HOME ADMISSION AGREEMENT IS VOID
          AS APPELLEE LACKED CAPACITY TO CONTRACT. .............. 10

        A. Shawn Frank lacked capacity to contract before, during and
           after his execution of the Admission Agreement..................... 10

        B. Appellants' own contemporaneous records establish Shawn
           Frank lacked capacity upon admission. .................................. 12

        C. Appellee Established Lack of Capacity to Contract................. 14

           1. *Expert David E. Mansfield, M.D. establishes Shawn Frank
              as totally incapacitated on the date and time of the
              execution of the agreement at issue.*....................................... 15

           2. *The affidavit of Peggy Barba, Shawn Frank's mother, also
              establishes that he was totally incapacitated on the date
              and time the agreement at issue was executed. .....................* 17

        D. Appellants' "lucid interval" argument fails. ........................... 18

           1. *The Affidavit of Terry Rowan must be disregarded and
              certainly does not support a "lucid interval" argument......* 19

2. *Appellants' argument that other records generated by them show "lucid interval" also fail to substantiate their claim and are not qualified opinions or observations.* ................... 22

E. The evidence establishes Shawn Frank lacked capacity to contract on the date and time of his execution of the agreement. ................................................................................. 23

II. THERE IS NO WAIVER OF ANY "RIGHT TO VOID" THE ADMISSION AGREEMENT, NOR IS APPELLEE SOMEHOW ESTOPPED FROM ESTABLISHING IT IS VOID, NOR BOUND BY THE DIRECT-BENEFITS ESTOPPEL THEORY. .................... 24

A. Appellants' "void v. voidable" argument is not valid. ........... 25

B. An incapacitated person can no more disaffirm an agreement than bind himself to it in the first place. ................................... 25

C. Appellee's previous pleading of breach of contract does not create an estoppel as it is a permissive "alternative theory", subsequently dropped by Appellee. ........................................... 26

D. The Direct-Benefits Estoppel argument does not apply ......... 27

III. THE ARBITRATION AGREEMENT IS VOID AND FEDERAL PREEMPTION OF STATE LAW BY THE FEDERAL ARBITRATION ACT ARGUMENTS FAIL .................................... 28

A. Texas Civil Practice and Remedies Code § 74.451 bars enforcement of this arbitration provision. ................................. 29

B. The FAA does not preempt Chapter 74 due to a lack of interstate commerce. ................................................................. 30

C. As a matter of policy, validating Appellants' position would destroy state's rights to enforce state law on many issues. .... 34

CONCLUSION ......................................................................................... 35

# TABLE OF AUTHORITIES

## CASES

*Buckeye Check Cashing v. Cardegna,*
546 U.S. 440, 448 (2005) ..................................................................................... 25

*The Fredricksburg Care Company, L.P. v. Perez,*
461 S.W.3d 513 (Tex. 2015), *reh'g denied* (June 26, 2015) ............................. 30

*Gaston v. Copeland,*
335 S.W.2d 406 (Tex. Civ. App.—Amarillo 1960, writ ref'd n.r.e.)............ 25

*Harrell v. Hochderffer,*
345 S.W.3d 652 (Tex. App.—Austin 2011, no pet) ................................. 20, 22

*In re December Nine Co., Ltd.*
225 S.W.3d 693 (Tex. App.—El Paso, no pet) ................................................. 32

*In re Estate of Gray,*
279 S.W.2d 936 (Tex. App.—El Paso 1955, writ ref'd n.r.e.) ........... 16, 21, 22

*In re L & L Kempwood Assoc, L.P.,*
9 S.W.3d 125 (Tex. 1999) ................................................................................... 30

*In re Morgan Stanley & Co,*
293 S.W.3d 182 (Tex. 2009) ............................................................................... 25

*In re Nexion Health at Humble, Inc.*
173 S.W.3d 67 (Tex. 2005) ................................................................................. 31

*In re Tenant Healthcare, Ltd.,*
84 S.W.3d 760 (Tex. App.—Houston [1st Dist.] 2002, no pet.) ................... 32

*J.M. Davidson Inc. v. Webster,*
128 S.W.3d 223 (Tex. 2003) ............................................................................... 11

*Oram v. General American Oil Company of Texas,*
513 S.W.2d 533 (Tex. 1974) ............................................................................... 26

*Prima Paint Corp. v. Flood & Conklin Mfg.*,
388 U.S. 395 (1967) ............................................................................... 11

*Regency Advantage L.P. v. Bingo Idea-Watauga, Inc.*,
936 S.W.2d 275 (Tex. 1996) ...................................................................... 27

*Rent-A-Center West, Inc. v. Jackson*,
130 S.Ct. 2772, 2778 (2010) ..................................................................... 11

*United States v. Girod*,
646 F.3d 304 (5th Cir. 2011)...................................................................... 33

*Zimmerman v. First American Title Ins.*,
790 S.W.2d 698 (Tex. App.—Tyler 1990, writ denied)................................ 27

## STATUTES

TEX. CIV. PRAC. & REM. CODE § 74.451 ................................................... 29

TEX. R. CIV. P. 48 ..................................................................................... 27

TEXAS GOVERNMENT CODE § 531.021 ....................................................... 31

NO. 03-16-00514-CV

IN THE COURT OF APPEALS
FOR THE THIRD JUDICIAL DISTRICT OF TEXAS
AT AUSTIN

OAK CREST MANOR NURSING HOME, LLC, DAY LIFE
CORPORATION, TERRY ROWAN, NORMA ELEMENTO, AND
GROVER MOORE,
Appellants,

v.

PEGGY BARBA, AS GUARDIAN OF S.F.,
Appellee.

On Appeal from the Probate Court,
Travis County, Texas, Cause No. C-1-PB-16-00776

**BRIEF OF APPELLEE**

**TO THE HONORABLE THIRD COURT OF APPEALS:**

Appellee Peggy Barba, As Guardian of S.F., files this Brief of Appellee, and submits this Brief in response to the Brief of Appellant in support of their interlocutory appeal of the Probate Court's decision to deny Appellants' Motion to Compel Arbitration, and would respectfully show this Court the following:

## RECORD AND APPENDIX REFERENCES

References to the Clerk's Record and Reporter's Record in this Brief are to page numbers. Clerk's Record references are abbreviated by page number as "(CR __)." Reporter's Record references are abbreviated by page number as "(RR __)." Appendix references to the Appendix attached to this document are abbreviated as "(Appellee App. __)." Appendix references to the Appendix attached to Appellants' Appendix are abbreviated as "(App. __)," to conform to Appellants' designation and to avoid confusion.

## STATEMENT REGARDING ORAL ARGUMENT

Appellants have requested oral argument. Appellee has no objection to oral argument if the Court deems it necessary. If oral argument is to take place, Appellee requests to have the opportunity to participate in same.

## INTRODUCTION

Appellee is an incapacitated, schizophrenic person that signed a 15-page nursing home admission agreement upon his involuntary admission to the home. This agreement contained an arbitration provision. Appellant seeks to enforce this agreement. Appellee contends that this admission agreement is void as the Appellee lacked capacity to enter into such agreement. As the law on this issue is unquestionably clear, if this Court agrees that Appellee lacked capacity to contract, this admission agreement is void, there is no arbitration provision to enforce, and therefore, there are

no other issues to address in this appeal. Simply, if Appellee lacked capacity, every other issue presented by Appellants is moot.

If, however, this Court finds that Appellee had capacity to enter into this agreement, stripping him of his constitutional right to trial by jury, the Court must address the applicability of Federal preemption, which would cause the Federal Arbitration Act to govern the enforceability of this particular arbitration provision. To reach a finding of Federal preemption, Appellants seek to have this Court find that interstate commerce is implicated in this situation involving a Texas resident and a Texas nursing home, solely because the Texas resident received Texas Medicaid benefits. This is a question of first impression.

If this Court finds that Appellee had capacity, and that Federal preemption does not apply, the arbitration provision at issue can not be enforced as it is in clear violation of Texas' laws regarding arbitration provisions in a health care liability context.

## ISSUES PRESENTED

**Issue No. 1:** Did Shawn Frank have capacity to execute the admission agreement at issue? Shawn Frank lacked capacity to contract when Appellants had him sign the 15-page contract waiving his constitutional rights. He lacked such capacity prior and following, continuously, as well, and this fact was known to Appellants upon Appellee's admission to

Appellants' nursing home. As such, there is no enforceable agreement, let alone an enforceable arbitration provision.

**Issue No. 2:** If Shawn Frank had capacity to execute the admission agreement at issue, does Federal preemption by the Federal Arbitration Act preempt the Texas' law statute that would render the arbitration provision in the admission agreement void for failure to comply with Texas law requisites for enforceable arbitration provisions in a health care context? The question of Federal preemption by the Federal Arbitration Act is never at issue as the entire agreement is void due to Shawn Frank's lack of capacity to contract. But even if it were, there is no implication of intestate commerce, precluding Federal preemption.

## STATEMENT OF FACTS

Shawn Frank is a mentally incapacitated adult, so much so that he was found totally incapacitated by the Probate Court for Travis County twice. (CR 117). He has a lengthy history of serious mental illness and total incapacitation. (CR 203, Appellee App A; CR 198, Appellee App B). Shawn Frank had been at Seton Shoal Creek Hospital for a month prior to his admission to Oakcrest Manor due to a psychotic event where he attacked an outpatient social worker after hearing voices and having delusions. He was put into Oakcrest Manor by a case worker upon his discharge from Shoal Creek and transfer to Appellants' facility, Oakcrest Manor, contrary to

Appellants' assertion that he "voluntarily" checked himself in as if he walked in, put down a credit card, and got a hotel room for the night. (CR 198, Appellee App B).

Upon his admission to Oakcrest Manor, staff of Oakcrest Manor made no less than 6 independent records at the time of his admission noting Mr. Frank's diagnosis of a history of mental illness including, but not limited to:

- Bipolar Affec
- Schizoaffective Disorder (Schizophrenia)
- Neurotic Disorder
- Depression

Appellants' records upon admission indicate "Hx of multiple psych admissions", "25(+) yr Hx of MI [mental illness}", and "suicidal attempts." (CR 200-06, Appellee App A). Nevertheless, the Administrator of Oakcrest Manor, Terry Rowan, had the totally incapacitated Shawn Frank execute the 15-page "Oakcrest Manor Nursing Home Admission Agreement" containing a waiver of his Constitutional right to trial by jury by way of an arbitration provision on page 12 that does not, in any way, comply with the Texas Civil Practice and Remedies Code's ban on and requirements for arbitration provisions in the health care field. (CR 106, App 3). The only signatures on the "contract" at issue are Plaintiff Shawn Frank, an incapacitated person, and Oakcrest Manor's Administrator. *Id.*

On January 13, 2014, Peggy Barba, Shawn Frank's current guardian, filed an application to be the guardian of Shawn Frank based on his complete

lack of capacity. (CR 110). Around that same time, she notified Appellants that Shawn Frank had called and warned of his intent to elope and jump off a bridge. After Appellee provided warning of his intent to elope and attempt suicide by jumping off a bridge,[1] Oakcrest Manor took no action, and allowed Shawn Frank to do that very thing about 1-day later, causing serious permanent injuries.

A physician appointed by the Probate Court, Dr. Roger McRoberts, examined Shawn Frank approximately 6 weeks after his admission to Oakcrest Manor and then filed with the Probate Court a Physician's Certificate of Medical Examination wherein he found:

- Mental Diagnosis: Schizophrenia (p.1)

- Ability to Make Reasonable Decisions (p.2):

> NO – Make complex business, managerial, and financial decisions
>
> NO – Determine the proposed ward's own residence
>
> NO – Attend to instrumental activities of daily living
>
> NO – Consent to medical and dental treatment
>
> NO – Consent to psychological and psychiatric treatment

- Evaluation of Capacity (p.4)

---

[1] Oakcrest was well aware of Shawn Frank's history of elopement and suicide attempts. (CR 147, 207, Appellee App A).

YES – "Based upon my last examination and observations of the Proposed Ward, it is my opinion that the Proposed Ward is incapacitated **according to the legal definition…** [emphasis in original]

- If you indicated that the Proposed Ward is incapacitated, indicate the level of incapacity:

TOTAL – The Proposed Ward is totally without capacity (1) to care for himself and (2) to manage his or her property.

(CR 113-16, Appellee App C). In fact, Dr. McRoberts' findings were so significant, he also found and indicated that Shawn Frank would NOT even be able to attend, understand and participate in his own guardianship hearing and recommended that he NOT attend such hearing. *Id.*

Nevertheless, Appellants seek to enforce this agreement and strip a totally incapacitated person of his Constitutional right to trial by jury.

In addition to the evidence above, Appellee also presented testimony from Dr. David Mansfield, a qualified physician in this area attesting to the fact that Shawn Frank was totally incapacitated on the date and time of his execution of the agreement at issue, and his guardian/mother, who not only repeated this fact, but further attested that Shawn Frank had been in the same condition for nearly 2 decades prior. (CR 198-99, Appellee App B). In stark contrast, Appellants contend that Shawn Frank had a "lucid interval" on the day of his admission, based on non-expert impressions from the nursing home administrator, Terry Rowan, who claims Appellee "seemed

fine," (CR 131), and vague nurse's notes that do not even attempt to claim Shawn Frank had capacity on their face. (CR 201, App 5; CR 203, App 7).

Appellants seek a finding from this Court that Shawn Frank had a "lucid interval" in an attempt to make the agreement enforceable, then seek this Court to address a question of first impression and find that because Shawn Frank received Medicaid benefits, interstate commerce is affected and, therefore, the Federal Arbitration Act preempts the Texas law that would otherwise make this arbitration agreement unenforceable as a matter of law, assuming Shawn Frank had capacity in the first place.

## SUMMARY OF THE ARGUMENT

The clear evidence establishes that Shawn Frank was totally incapacitated by way of his extensive and severe mental illness, which the record demonstrates he had for about two decades prior to his admission to Oakcrest Manor. This was further supported by the Court-appointed physician who declared him totally incapacitated approximately 6-weeks after Mr. Frank's admission, yet Appellants characterize to this Court Mr. Frank's incapacity as if he was just fine on the date of his admission, yet suddenly contracted schizophrenia and neurotic disorder during the next 6 weeks as if he caught the flu. Their only real evidence is that Terry Rowan, the Administrator, not a health care professional, said he "seemed fine."

No matter what position Appellants take regarding Federal preemption or the Federal Arbitration Act, no matter what case or statutory authority they present, Texas law is clear that any presumption favoring arbitration arises only *after* the party seeking to compel arbitration proves that a valid arbitration provision exists. In other words, if there is no valid contract, the arbitration provision and the relevant laws governing just do not matter. Appellants simply cannot jump this hurdle.

The undeniable facts are:

1. Shawn Frank was incapacitated on December 13, 2013 (the date of his admission to Oakcrest Manor), suffering from the same mental illnesses that he still had on January 30, 2014, and had for at least 15 years prior; and

2. Appellants *knew* on December 13, 2013 (the date of Plaintiff's admission) that Shawn Frank was incapacitated.

This was the basis for the Probate Court's decision to deny Appellants' request to compel arbitration.

Assuming this Court finds that Shawn Frank *did* have the capacity to contract, Appellants seek a ruling of Federal Arbitration Act preemption because the arbitration provision forced on this incapacitated Plaintiff does not comply with Texas state law, but <u>may</u> possibly comply with the FAA's more lax standard. Appellants' arguments are fatally flawed for the following reasons:

1) Shawn Frank was, is and continues to be an incapacitated person (as deemed by the Probate Court), clearly lacking capacity to enter into the "contract" and voiding the agreement containing the at-issue arbitration provision;

2) Texas Civil Practices and Remedies Code § 74.451 clearly bars arbitration provisions in Health Care Liability Claims other than in limited circumstances, which do not exist in this case;

3) The Federal Arbitration Act does not preempt the above-referenced Texas statute due to a lack of interstate commerce implications; and

4) Public policy mandates rejection of Appellants' arguments as accepting same would have catastrophic results on not only health care liability law, but on contract law and state's rights in general.

The analysis of this case is, therefore, did Shawn Frank have capacity to enter into this agreement? If no, there is no arbitration and no other issues are reached. If yes, does Federal preemption apply? If no, the arbitration agreement at issue is unenforceable and there is no arbitration. If yes, must this Court compel arbitration?

## ARGUMENT

### I. THE NURSING HOME ADMISSION AGREEMENT IS VOID AS APPELLEE LACKED CAPACITY TO CONTRACT.

#### A. Shawn Frank lacked capacity to contract before, during and after his execution of the Admission Agreement.

Shawn Frank, a diagnosed schizophrenic, is and was totally incapacitated. This fact was substantiated by the qualified physician expert who examined Shawn Frank for the Probate Court (CR 113-16, Appellee App C), and then further ratified by this Court when this Court granted

guardianship to Peggy Barba, Shawn Frank's mother. (CR 117). The Probate Court stated in its order "that Shawn Frank <u>continues to be</u> an incapacitated person and that he no longer has capacity to manage his property." *Id.*

It is fundamental to contract law that a party must have capacity to contract to form a valid and binding agreement. Neither arbitration provisions, nor the Federal Arbitration Act (FAA), are immune from basic principles of contract formation. In *Rent-A-Center West, Inc. v. Jackson,* the United States Supreme Court (citing an earlier of its opinions) stated:

> "To immunize an arbitration agreement from judicial challenge on the ground of fraud in the inducement would be to elevate it over other forms of contract,"

130 S.Ct. 2772, 2778 (2010) (citing *Prima Paint Corp. v. Flood & Conklin Mfg.* 388 U.S. 395 (1967)). In so doing, the Supreme Court clearly delineates that challenges to the validity of *the entire agreement* are issues for state law, not that of an arbitrator.

The Texas Supreme Court has remained consistent with the U.S. Supreme Court in noting that the strong presumption favoring arbitration arises only *after* the party seeking to compel arbitration proves that a valid arbitration provision exists. *J.M. Davidson Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003). Thus, a party seeking to compel arbitration must first show that the agreement itself meets all requisite contract elements. *Id.* There is not

a state in this country that fails to require capacity to contract as a fundamental prerequisite of a contract.

As Shawn Frank is, was, and continues to be totally incapacitated, Frank could not form a valid contract with Oakcrest Manor, and certainly not a valid and binding agreement to arbitrate, which according to Dr. McRoberts, Frank could not have understood. (CR 113-16, Appellee App B). As such, Appellants' Motion to Compel Arbitration, centered around a 15-page contract made between a nursing home and a judicially-adjudicated incompetent person, was properly denied by the lower Court.

**B.  Appellants' own contemporaneous records establish Shawn Frank lacked capacity upon admission.**

Appellants' own admission records establish Shawn Frank was incapacitated at the time of admission.  The records of Oakcrest Manor demonstrate that Appellee was admitted on December 13, 2013 at or around 3:00pm.  Oakcrest Manor itself generated the following records, most of them made immediately upon admission (same day, and often within the first hour after admission), all of which demonstrate clearly Appellee's lack of capacity at the date and time of his admission:

1. <u>Oakcrest Manor Face Sheet</u>, made by Oakcrest Manor on December 13, 2013 at 4:12pm, delineating under "Current Dx" that Frank had:

    1. 296.52 Bipolar affec, Depressive
    2. 295.40 Ac Schizophrenia
    3. 300.9 Neurotic Disorder

(CR 200, Appellee App A).

Oakcrest Manor Resident - Data Collection Status Upon Admission, made by J. Chudleigh (Attending Physician) on December 13, 2013 at 3:10pm showing a diagnosis of "Bipolar, Depression, Schizophrenia. (CR 201, Appellee App A).

2. Oakcrest Manor Nursing Home Discharge Summary, created on January 15, 2014, noting that Frank's admission to Oakcrest was on December 13, 2013 and his "admission diagnosis(es)" were "Bipolar Affec. Depr-mod., Schizophrenia, Neurotic Disorder". (CR 202, Appellee App A).

3. Oakcrest Manor Nurse's Notes, created upon admission on December 13, 2013 stated:

> 3pm adm. From Shoal Creek 40 yr old schiz[ophrenic] w/ male. Long Hx of mental illness. Suicidal…jumped from a bridge in Nov. Has a long Hx of violence.

(CR 203, Appellee App A).

4. Oakcrest Manor All Disciplines to Use Progress Notes, created only 4 days later on December 17, 2013 stated:

> First OCNH [Oakcrest Nursing Home] admission for this 40 yo single male who came to NH from SCH [Shoal Creek Hospital]. *He has a long Hx of MI & multiple psych stops. His MI started in teen years* & was worsened by drug use. Res jumped off bridge on 6/12 . . . Since then *he has been in/out of psych hosp* . . . He denies MI.

(CR 204, Appellee App A).

5. Oakcrest Manor Social Services Assessment, created on December 17, 2013, recites all of the following facts about Shawn Frank:

> 1. Hx of multiple psych admissions
> 2. Schizophrenic

3. Long Hx of MI [mental illness]
4. Reports of suicidal attempts
5. 25 (+)- yr Hx of MI with multiple psych st.

(CR 205, Appellee App A).

Each of these records were created <u>by the Appellants</u>, and most <u>at the precise date and time of Appellee's admission</u> to Oakcrest Manor, and all of them establish Plaintiff's lack of capacity <u>at the date and time of the execution of the agreement</u> at issue. Each of these records <u>created by the Appellants</u> demonstrate clearly that, upon his admission, Mr. Frank was suffering from the precise mental conditions that caused him to be totally incapacitated that were the basis of the Probate Court's decision to find him incapacitated as a matter of law. Hence, Appellants' own records create more than sufficient proof that Shawn Frank lacked capacity to contract at the precise time Oakcrest Manor made him sign their 15-page Admission Agreement, waiving his Constitutional right to a trial by jury.

### C. Appellee Established Lack of Capacity to Contract.

Appellee established that Shawn Frank lacked capacity to contract on the date and at the time that he was forced to sign a contract, which does not comport with Texas law, upon his *involuntary* admission to Oakcrest Manor. Such proof came in the form of the following:

1. <u>Appellants' own nursing home admission records</u> demonstrating that Oakcrest Manor *knew* at the exact date and time of Shawn Frank's admission to Oakcrest Manor that Shawn Frank lacked

capacity to contract. As well, these records prove that at the time of the hearing on this issue in the Probate Court, Appellants were aware that they knew of Shawn Frank's lack of capacity at the exact date and time he was admitted to the home, although they attempted to divert the issue. (Addressed in the previous section).

2. Affidavit of David E. Mansfield, M.D., a medical doctor with over 40 years of experience, attesting that Shawn Frank suffered from schizoaffective disorder (schizophrenia), bipolar disorder and depression on December 13, 2013 at the time of Shawn Frank's admission to this nursing home. As such, he lacked the capacity to contract (he was totally incapacitated) and that, given the nature of his mental illness, he may even present as if he was coherent and able to process and understand the 15-page contract, even though he was not. (CR 196-97, Appellee App D).

3. Affidavit of Peggy Barba, Shawn Frank's mother, who attests that her son was admitted to this home by a case worker, not voluntarily (unlike Appellants' assertion), and that her son had suffered from these same mental illnesses for at least 15 years prior to his admission to Oakcrest Manor that rendered him totally incapacitated. (CR 198-99, Appellee App B).

1. *Expert David E. Mansfield, M.D. establishes Shawn Frank as totally incapacitated on the date and time of the execution of the agreement at issue.*

David E. Mansfield, M.D. is a medical doctor with extensive experience in both medicine and nursing homes. In his affidavit, Dr. Mansfield describes Shawn Frank as "a person who likely cannot distinguish what is real and what is false" and notes that persons with Frank's

conditions "can even appear lucid, responsive and as if they have full capacity when, in fact, they do not." (CR 196-97, Appellee App D).

Most importantly, Dr. Mansfield declares:

> …to a reasonable degree of medical probability, based on Shawn Frank's condition, he would lack sufficient capacity to contract and would require a guardian. It is further my opinion that, to a reasonable degree of medical probability, Shawn Frank was totally incapacitated on December 13, 2013, the day he was admitted to Oakcrest Manor, as he was prior to his admission, and as he continues to be.

*Id.* This expert testimony should establish that Appellee was totally incapacitated when executing the agreement at issue, rendering it unenforceable.

Appellants' contention regarding Dr. Mansfield's testimony is that is is "conclusory" or "vague." They are critical of Dr. Mansfield's general descriptions of how persons with the psychological ailments suffered by Shawn Frank manifest such ailments. They skip over the quoted portion of Dr. Mansfield's testimony above that opines conclusively that Shawn Frank lacked capacity *on December 12, 2013*. If this Court considers any evidence of capacity, it must weight Dr. Mansfield's testimony the most heavily.

As is addressed directly in *In re Estate of Gray*, 279 S.W.2d 936 (Tex. App.—El Paso 1955, writ ref'd n.r.e.), which is both cited and relied upon by Appellants, absent sufficient familiarity with the alleged incapacitated

person, the Court should exclude non-expert testimony regarding capacity. This should result in the exclusion of all of Appellants' proposed evidence, but should as well result in the expert opinion of Dr. Mansfield (and Dr. McRoberts) being the most heavily weighted evidence of Shawn Frank's incapacity.[2]

### 2. *The affidavit of Peggy Barba, Shawn Frank's mother, also establishes that he was totally incapacitated on the date and time the agreement at issue was executed.*

In further support, Appellee submitted the affidavit of Peggy Barba, Frank's mother and legal guardian. (CR 198-99, Appellee App B). Having clearly superior personal knowledge of his condition, Mrs. Barba testifies that her son has suffered from severe mental illness since he was a teenager. *Id.* This fact is also supported by Defendant's own records. (CR 200-205, Appellee App A). Mrs. Barba also notes her son has a long history of mental illness that preceded his admission to Oakcrest Manor by at least 15 years. (CR 198-99, Appellee App B).

In addition, Mrs. Barba testifies that Appellee did not "voluntarily check himself in" as Appellants would have this Court believe. According to Mrs. Barba, a case worker checked Shawn Frank in to Oakcrest Manor. Appellants couch the facts as if Appellee was normal, lucid and had full

---

[2] This case is discussed in further detail below in Section I.D.1.

faculties and he simply elected to move in to Oakcrest Manor to support their argument that the agreement at issue should be enforced. Mrs. Barba's testimony proves this is simply not the case.

### D. Appellants' "lucid interval" argument fails.

Appellants essentially argue to this Court that a known schizophrenic, whom even they admit lacked capacity 6 weeks after his admission to their nursing home, had, at the time of signing their admission paperwork, a "lucid interval," rendering Appellee temporarily competent when he was asked to sign their 15-page Admission Agreement. The foundation of Appellants' argument is built around the observations of their nursing home Administrator, Terry Rowan (who has no medical training), and their records that indicate Shawn Frank was "alert" and "answered questions", was "cooperative" and showed no "behavior problems." In doing so, Appellants ignore the testimony and opinions of the only two trained medical professionals whom have offered opinions (Dr. McRoberts and Dr. Mansfield), both of whom opine that Shawn Frank was totally incapacitated and, further, "can even appear lucid, responsive and as if they have full capacity when, in fact, they do not," based on a reasonable degree of <u>medical</u> probability, and based on his mental condition. Their provided "proof," at best, fails to substantiate a "lucid interval," but practically speaking, provides <u>no</u> evidence of his mental condition/mental capacity.

Appellants admit that "Frank had battled mental illness prior to his admission to Oakcrest Manor." (Brief of Appellant at 12). Yet they claim that "the facts show he was still capable of lucid intervals. . ." *Id*. Appellants provide <u>no</u> proof of this assertion whatsoever. There is not a single piece of evidence that a person with Shawn Frank's condition was capable of "lucid intervals." Rather, they take the same testimony that fails to establish that Shawn Frank contracted during a "lucid interval" and claim that same insufficient evidence also establishes that he was capable of having "lucid intervals," which is not only unsupported by the medical testimony, but contrary to it.

### 1. The Affidavit of Terry Rowan must be disregarded and certainly does not support a "lucid interval" argument.

Terry Rowan's affidavit is evidence of nothing. Terry Rowan is the Administrator of Oakcrest Manor. By its own terms, the affidavit establishes that Terry Rowan has no relevant or admissible opinion. Terry Rowan's only area of knowledge, by the statements in the affidavit itself, establish that he has no medical knowledge of any kind, yet Mr. Rowan opines that Appellee was "lucid" during their meeting. (CR 131). His statement is, at best, speculative, particularly given his complete lack of medical expertise. Mr. Rowan's opinion would not be admissible at trial on this issue, and should not be considered in this appeal.

Mr. Rowan's testimony is that "Frank was able to follow along and participate in the conversation." *Id.* As noted by Dr. Mansfield, Shawn Frank's condition could make him appear "lucid, responsive and as if they have full capacity when, in fact, they do not." (CR 196-97, Appellee App D). He further patently speculates that Shawn Frank "understood Rowan's questions", for which there is no baseline, no verification, and being stated by a person with <u>no</u> medical training to make such an evaluation or render such an opinion.

Appellants rely on *Harrell v. Hochderffer*, 345 S.W.3d 652, 661 (Tex. App.—Austin 2011, no pet) for a recitation of the law regarding what is required to show incapacity, but they ignore the central findings of this Court in that case. In *Harrell*, the evidence of incapacity was that the alleged incapacitated person signed his name as "G" even though he had no "G" in his name. Further, the alleged incapacitated person had a guardian ad litem appointed 4 months earlier. This Court noted that evidence of capacity "must transcend mere suspicion," that evidence "so slight as to make an inference a guess" do not constitute evidence. *Id.* This Court found the evidence in *Harrell* insufficient, and that evidence was far more compelling than the observations of persons with no medical training, particularly when weighed against two qualified medical opinions as exist in this record.

More importantly, the Appellants also cite *In re Estate of Gray*, 279 S.W.2d 936 (Tex. App.—El Paso 1955, writ ref'd n.r.e.) for the proposition that an incapacitated person may have a "lucid interval", rendering such person with capacity during that interval. Even a cursory reading of this opinion demonstrates that Appellants' arguments fail.

In *Gray*, the Court examined at length the capacity of a testator. Directly demonstrating Appellee's position that the "evidence" proffered by Appellant is insufficient as a matter of law, the Court stated:

> Now it must be observed with reference to the preceding points and the matters involved therein that it is a matter of law as to whether or not a lay witness has qualified himself so as to testify and give opinions as to lack of sanity of a testator. Here the court ruled that the witnesses involved had not had enough contact and observation to so qualify, and excluded their opinions on such grounds. . .

*Id.* at 940. The Court's holding was referring to not 1, but 2 witnesses whose testimony should be excluded as the witnesses had neither qualified as an expert witness, nor had sufficient familiarity with the testator to pass judgment on the testator's state of mind when they made observations such as "her memory seemed to be defective", or that "something was wrong with her" as she asked the same question twice. *Id.* at 939. In both cases, these witnesses had met the testator on previous occasions (unlike Mr. Rowan or any nurse at Oakcrest Manor), yet the Court still found lack of familiarity

with the testator for their "observations" to be of any relevance to the issue of capacity of the testator.

Mr. Rowan's statements should not be permitted as a lay opinion either. Mr. Rowan has no prior knowledge of Shawn Frank, and Appellants seek to admit his observations of a person who did not know, and had never met, Shawn Frank as evidence of Mr. Frank's lucid mental state and capacity. This is particularly true given the expert testimony of Dr. Mansfield, who opines conclusively that people with Plaintiff's condition can often appear lucid, even when they are not.

> **2. *Appellants' argument that other records generated by them show "lucid interval" also fail to substantiate their claim and are not qualified opinions or observations.***

Appellants also refer to assessments of Shawn Frank that appear in nurse's notes as further evidence of "lucid interval." Their claim is that the following references support their position: Frank "Answers Questions: Readily," has apparent quick comprehension, is "cooperative," "independent *mostly*," and shows "no behavior problems." None of these references, on their face, address whether Shawn Frank "had sufficient mind and memory at the time of execution to understand the nature and effect of [his] act," as required under Texas law. *See Harrell*, 345 S.W.2d at 661 (noting that the evidence must transcend mere suspicion); *see also, In Re Estate of Gray*, 279 S.W. 2d at 940 (excluding analogous evidence as the witnesses

lacked any expert credentials to attest on capacity issues and _their_ personal knowledge of the testator was too limited to provide reliable observations of the testator).

In this instance, Appellants' alleged proof centers around untrained, non-expert witnesses, all of whom had _no_ prior contact with Shawn Frank. As such, the proffered evidence of Appellants has no bearing on the issue of Shawn Frank's capacity. However, the testimony of his mother and two independent, qualified physicians have direct bearing.

**E.      The evidence establishes Shawn Frank lacked capacity to contract on the date and time of his execution of the agreement.**

Simply, the most qualified evidence of capacity comes from the expert opinions of Dr. McRoberts and Dr. Mansfield, who find clearly, and medically, that Shawn Frank lacked capacity.  Second to the expert testimony, Shawn Frank's mother, and guardian, is in the best position to know his state of mind that day due to her direct knowledge of her son and his nearly 20-year history of incapacitating mental illness. Although Appellants contend Shawn Frank had capacity that day, their own records establish not only his incapacitating mental illness, but their knowledge of it when they required he sign the admission agreement waiving his Constitutional rights. In response, Appellants only offer the affidavit of a non-medically trained, non-expert witness, Terry Rowan, the nursing home administrator who was responsible for getting Mr. Frank to sign the at-issue

agreement, and a few vague references from nurse's notes that do not contain any information relevant to the question of Shawn Frank's capacity. And even if they did, their observations are made by persons with no previous knowledge of Mr. Frank, rendering them useless as was the case in *In Re Estate of Gray*, where the witnesses at issue had met the testator on at least 1 prior occasion. In short, the evidence conclusively establishes Shawn Frank's lack of capacity that day, rendering the admission agreement void.

## II. THERE IS NO WAIVER OF ANY "RIGHT TO VOID" THE ADMISSION AGREEMENT, NOR IS APPELLEE SOMEHOW ESTOPPED FROM ESTABLISHING IT IS VOID, NOR BOUND BY THE DIRECT-BENEFITS ESTOPPEL THEORY.

In an attempt to sidestep the issue that Shawn Frank lacked capacity to contract in the first place, Appellants' contend in their second issue that Appellee somehow waived his right to void the contract. Their contention is based on three positions:

(1) That a contract made by a person who lacked capacity is merely voidable and, therefore, some step must be taken to disaffirm it or it remains valid.

(2) By counsel for Appellee pleading an alternative theory of recovery in the underlying case of breach of a contract that Appellants contend exists, he is somehow estopped from establishing that the contract is void.

(3) The Direct-Benefits Estoppel argument precludes Shawn Frank from invalidating the agreement even though this theory only applies to third-party beneficiaries to an agreement.

Appellants arguments not only fail, but do not make any logical sense.

## A.    Appellants' "void v. voidable" argument is not valid.

In their first point, Appellants contend that contracts made by incompetent persons are generally voidable, not void.  Their <u>only</u> authority for this position is a single opinion from Amarillo issued nearly 60 years ago, *Gaston v. Copeland,* 335 S.W.2d 406 (Tex. Civ. App.—Amarillo 1960, writ ref'd n.r.e.), which has never been relied upon for this position, and is contrary to the law. The Texas Supreme Court directly addressed this issue in *In re Morgan Stanley & Co,* 293 S.W.3d 182 (Tex. 2009). In stark contrast to the *Gaston* opinion, the Texas Supreme Court noted that defenses to a contract as a whole, like incapacity, render the entire contract void or unenforceable. *Id*. at 185. In so doing, the Texas Supreme Court also noted that the United States Supreme Court "rejected the notion that the enforceability of the arbitration agreement depended on the distinction between void and voidable contracts." *Id.* (citing *Buckeye Check Cashing v. Cardegna*, 546 U.S. 440, 448 (2005)). Hence, Appellants' contention is wrong, which is the foundation of their argument on this point.

## B.    An incapacitated person can no more disaffirm an agreement than bind himself to it in the first place.

Further, Appellants' extended position (that, as such a contract is merely voidable, thus requiring some action to disaffirm the contract), makes no logical sense. If this were true, their argument would literally mean that if an incapacitated person contracted, that same incapacitated

person would then have to take an affirmative step to disaffirm the contract. The whole point of incapacity is that the incapacitated person cannot properly understand the effects of his or her actions. The Court can no further rely on the disaffirmation of an incapacitated person than it can the original action sought to be disaffirmed.

Appellants rely on *Oram v. General American Oil Company of Texas*, 513 S.W.2d 533 (Tex. 1974). This case is in no way analogous. *Oram* dealt with a landlord that was incapacitated when he entered into a contract. However, after regaining capacity, he continued to seek the benefits of that agreement *with full knowledge of its terms*. As such, the Court found a ratification of the agreement that would have been otherwise unenforceable. *Id*. at 534. Unlike this case, *Oram* involved an incapacitated person that regained capacity and lived under a contract's terms for several years after, whereas in this case, Appellee did not have capacity at execution of the agreement, did not have it for many years prior, and has not (nor will not) ever regain capacity.

> **C.** **Appellee's previous pleading of breach of contract does not create an estoppel as it is a permissive "alternative theory", subsequently dropped by Appellee.**

Appellants contend that by pleading breach of contract in the underlying case, Appellee is somehow estopped from contesting capacity or, in the alternative, has ratified the contract. However, Texas law expressly permits the assertion of "alternative theories." The Rules provide:

> A party may set forth two or more statements of a claim or defense alternatively or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as he has regardless of consistency and whether based upon legal or equitable grounds or both.

TEX. R. CIV. P. 48. This Rule is equally applicable even when the alternative theories are inconsistent. *Zimmerman v. First American Title Ins.*, 790 S.W.2d 698 (Tex. App.—Tyler 1990, writ denied); *see also, Regency Advantage L.P. v. Bingo Idea-Watauga, Inc.*, 936 S.W.2d 275, 278 (Tex. 1996). The express permission granted by the Texas Rules of Civil Procedure to plead alternative theories invalidates Appellants' argument, particularly coupled with the fact that Appellee has amended her petition and dropped any breach of contract claim, or any contractual remedies, rendering this argument both invalid and moot.[3]

### D. The Direct-Benefits Estoppel argument does not apply.

Lastly, Appellants contend that Appellee is bound to the unenforceable arbitration provision due to the direct-benefits estoppel theory, which is wholly misapplied. Each of the cases cited by Appellants

---

[3] Prior to the filing of this Brief, Appellee filed an Amended Petition in the underlying case that removes any claim based in any contractual theory.

addresses a singular point – a non-party who seeks the benefits of a contract is also bound by that contract's arbitration provision. While true, it is inapplicable.

In this case, Shawn Frank is not a non-party or a third-party beneficiary to this alleged contract. He is the claimed party. These laws are intended for third-party beneficiaries of a contract. Appellants contend nonetheless that it applies to Shawn Frank as he, a continuing incapacitated person, continued to get care from this nursing home. Well, of course he did. He is incapacitated and cannot even make his own choice as to where he can live or who can render care to him, nor does he have other living arrangements. More importantly, as an incapacitated person, he no more sought the benefits of this agreement than agreed to it in the first place as he lacks capacity for either and was moved out of this facility by his guardian after his recovery from his injuries at issue in this matter.

## III. THE ARBITRATION AGREEMENT IS VOID AND FEDERAL PREEMPTION OF STATE LAW BY THE FEDERAL ARBITRATION ACT ARGUMENTS FAIL.

To reach the issues of (A) the applicability of Chapter 74's bar of non-compliant arbitration provisions and/or (B) the applicability of Federal preemption based on the Federal Arbitration Act ("FAA"), this Court would have to find Shawn Frank, an incapacitated person, had capacity. If this Court does, then it must address first the applicability of Chapter 74's

mandates regarding arbitration provisions and whether they are preempted by the FAA. The FAA will preempt only in the instance of an interstate commerce transaction, and Appellants' arguments in this regard stretch the law and authority in this area far beyond its finite elastic limit.

The simple facts in this case are that Plaintiff Shawn Frank is and was a Texas resident, this is a Texas health care facility, and Plaintiff Shawn Frank did not receive Federal Medicare benefits.

**A. Texas Civil Practice and Remedies Code § 74.451 bars enforcement of this arbitration provision.**

Section 74.451 definitively prohibits a health care provider from enforcing an arbitration provision, unless that provision was also signed by the patient's attorney, which was not done in this case, and clearly not in dispute. The statute mandates:

> No physician, professional association of physicians, or other health care provider shall request or require a patient or prospective patient to execute an agreement to arbitrate a health care liability claim unless the form of the agreement delivered to the patient contains a written notice in 10-point boldface type clearly and conspicuously stating:
> UNDER TEXAS LAW, THIS AGREEMENT IS INVALID AND OF NO LEGAL EFFECT UNLESS IT IS ALSO SIGNED BY AN ATTORNEY OF YOUR OWN CHOOSING. THIS AGREEMENT CONTAINS A WAIVER OF IMPORTANT LEGAL RIGHTS, INCLUDING YOUR RIGHT TO A JURY. YOU SHOULD NOT SIGN THIS AGREEMENT WITHOUT FIRST CONSULTING WITH AN ATTORNEY.

TEX. CIV. PRAC. & REM. CODE § 74.451(a). Furthermore, this statute provides that a violation of section (a) constitutes a violation of the Texas Occupations Code (and therefore requires sanctions and penalties thereunder) and also constitutes a violation of the Texas Deceptive Trade Practices Act. *Id.* at (b) and (c).

A cursory read of the at-issue Admission Agreement clearly establishes two things: (1) the arbitration provision does not comply with Section 74.451(a); and (2) the Admission Agreement was not signed by an attorney at all, let alone one of Shawn Frank's choosing. (CR 108, App 2). This voids the arbitration provision as a matter of law and Appellants' Motion should be denied.

## B. The FAA does not preempt Chapter 74 due to a lack of interstate commerce.

A number of courts have found that, in limited instancdes, the Federal Arbitration Act preempts the state law, giving preference to the enforceability of an arbitration provision. As the Appellants point out, this preemption stems from arbitration clauses in contracts "that affect interstate commerce." *In re L & L Kempwood Assoc, L.P.*, 9 S.W.3d 125 (Tex. 1999). Curiously, the Appellants site a number of Texas cases, however, do not address the most recent – *The Fredricksburg Care Company, L.P. v. Perez*, 461 S.W.3d 513 (Tex. 2015), *reh'g denied* (June 26, 2015). Although *Perez* finds Federal preemption in that case, it is exceedingly clear from its holding that

the preemption was based on the resident receiving Federal <u>Medicare</u> benefits, an unquestionably Federally-funded program.

In this case, Plaintiff Shawn Frank received <u>only</u> Medicaid funds and the State of Texas, in its own documents, not only calls Medicaid a "state program", the Attorney General issued a certification, certifying that the Health and Human Services Commission is "the single state agency responsible for administering the plan," and that "The legal authority under which the agency administers the plan on a statewide basis is: Texas Government Code, Section 531.021(b)." (CR 120-22, Appellee App E). Further, in looking at the description of the plan in the "Organization and Functions of the State Agency and the Organization Chart of the Agency" along with the organization chart itself, there is simply no way to view Medicaid as a Federal program, giving this nursing home the protections of a non-compliant arbitration provision in an admission agreement their Administrator had signed by a diagnosed schizophrenic upon admission. *Id.*

Appellants' principal support for their argument comes first from *In re Nexion Health at Humble, Inc.* 173 S.W.3d 67 (Tex. 2005). *In re Nexion* involved a patient directly receiving <u>Medicare</u> benefits so the Court never addressed nor confronted the applicability of Federal preemption when dealing simply with Medicaid. *Id.*

Second, the Appellants rely on *In re Tenant Healthcare, Ltd.*, 84 S.W.3d 760, 765 (Tex. App.—Houston [1st Dist.] 2002, no pet.). Appellants cavalierly site this case to this Court for the proposition that the Federal preemption extends to cases involving both Medicare and Medicaid. *In re Tenant Healthcare* is an arbitration provision contained in an <u>employment agreement</u> between the nursing home, and its employee, a distribution clerk. The Court did not have to address the interstate commerce issue for two reasons: (1) this nursing home unquestionably engaged in interstate commerce; and more importantly, (2) this issue was not challenged by the employee seeking to invalidate the arbitration provision. The court stated:

> Here, Tenet's first amended motion to compel arbitration alleged that Park Plaza Hospital, where Valyan worked, treated patients who lived out-of-state; received goods and services from out-of-state; received payments from out-of-state insurance carriers; and received federal funds such as Medicaid and Medicare. Valyan does not challenge these allegations.

*Id.*

Similarly, the Appellants cite *In re December Nine Co., Ltd.* 225 S.W.3d 693 (Tex. App.—El Paso, no pet) for the proposition that Federal preemption is granted due to the existence of Medicaid benefits. While the Court in this case declines to limit Federal preemption based on Federal funding to Medicare cases only, and "sort of" suggests that it may apply in cases with Medicaid funding, the Court notes mainly that the arbitration agreement at

issue indicated on its face that it was to be "governed by Federal arbitration law." *Id.* at 698. More importantly, *In re December Nine* was another example of the Court applying this decision only in the context of an employment contract, in this case, where two employees were fired for whistle-blowing.

Finally, Appellants put, up front and center, the case of *United States v. Girod*, 646 F.3d 304 (5th Cir. 2011). This case is equally inapplicable. Appellants cite this case for the singular proposition that <u>Medicaid</u> is federally funded, therefore anything tied to it affects interstate commerce. But *Girod* is inapplicable on one significant point. As directly stated in that opinion, the <u>Louisiana</u> Medicaid program (at issue in <u>that</u> case) is a joint Federal-State program, in stark contrast to the <u>Texas</u> Medicaid program, as noted above. (CR 120-22, Appellee App E).

The authority cited by the Appellants can not be stretched to the limit of their position. And the law on this issue simply does not address, let alone support, Appellants' position. Not one of the cited cases reaches, or holds, that receipt of Medicaid benefits would give rise to interstate commerce implications sufficient to trigger Federal preemption. The reason is, undoubtedly, that, in Texas, Medicaid is a <u>State</u> program in contrast to Medicare, which is clearly a Federal program. Appellants request that this Court address a question of first impression and extend the law in this area beyond the limits of their own analysis and past the point of appropriate.

**C.** **As a matter of policy, validating Appellants' position would destroy state's rights to enforce state law on many issues.**

The Appellants' position is:

(1) We know Medicaid is a State program, but some of the money came from the Federal Government, so that's interstate commerce; and/or

(2) If a nursing home accepts Medicare, even if not for the benefit of the actual resident/patient at issue, the nursing home should have blanket protection from the FAA.

There can be no interpretation of these arguments that lead to anything other than a massive slippery slope, fundamentally destroying the State's rights to enforce its own contract laws. If the Court were to accept premise (1), the law could be stretched to the extent that a patient in a nursing home would be subject to Federal preemption on this issue if the resident paid by credit card as the bank that issued the credit card or processed the credit card may have been out-of-state, or if the resident paid cash because the bills were printed by the Fed. In what case could a transaction ever be considered an in-state transaction? In such case, it would invalidate the State's ability to charge sales tax as well.

If the Court were to accept premise (2), this law could be stretched such that your visit to your own doctor could be governed by a non-conforming arbitration provision, because your doctor treats an out-of-state patient or accepts Federal funds on even a single patient. For that matter, the doctor

could enjoy preemption because he/she buys supplies from an out-of-state vendor, hence engaging in interstate commerce.

While it seems ridiculous enough that the Courts agree with the proposition that accepting federal funding for a patient constitutes interstate commerce when the patient and health care facility are both from the same state, stretching these laws to the limit that is done so in Appellants' Motion will radically alter states' rights and the relationship of a patient to his/her health care provider irreparably and destructively.

## CONCLUSION

This is a very simple situation. Plaintiff Shawn Frank was totally incapacitated at the time of his admission to Oakcrest Manor. This fact has been found as a matter of law by the Probate Court of Travis County twice. The Appellants are asking this Court to find a contract between a nursing home and its totally incapacitated resident enforceable, which was signed without the presence of a guardian or an attorney. This is simply impossible and conflicts with contract law.

The evidence clearly establishes Plaintiff lacked capacity when he executed the agreement at issue, first through Appellants' own records made immediately upon Plaintiff's admission to Oakcrest Manor, second, the Probate Court's independent medical examiner (Dr. Roger McRoberts), and as well through the expert testimony of David E. Mansfield, M.D. and also

through the testimony of Plaintiff's mother, Peggy Barba. Further, the only expert medical evidence in this case proves that he did not, and that, given Plaintiff's condition, he could have appeared to have had capacity even though medically he did not.

Appellants' only responses to Appellee's capacity arguments are that: (1) there is no evidence that Plaintiff was incapacitated at the date and time Plaintiff executed the agreement, and (2) Plaintiff "seemed fine" to Terry Rowan, Oakcrest Manor's administrator, and a person with no personal knowledge of Plaintiff when he was admitted, and no medical expertise whatsoever. The attached evidence establishes both objections without merit.

Even assuming Appellee had capacity, which he did not, Appellants' Federal preemption argument likewise fails. This is a case involving a citizen and resident of the State of Texas and a Texas nursing home. Appellants' attempt to create a Federal issue due to Appellee's status as a Texas Medicaid recipient stretches the law on this issue as well as creates far reaching public policy implications. The law simply does not permit this result.

## PRAYER

Appellee Peggy Barba, as Guardian of S.F., respectfully requests that this Court confirm the order of the trial court denying Appellants' Motion to

Compel Arbitration and for such other and further relief to which she is entitled.

Respectfully submitted,

**RAMSEY LAW GROUP**

**Jeff Diamant (Of Counsel)**
State Bar No. 00795319
**John C. Ramsey**
State Bar No. 24027762
**Joel Pardo**
State Bar No. 24083617
7521 Westview Drive
Houston, TX 77055
Phone: (713) 489-7577
Fax:  (888) 858-1452
Email: john@ramseylawpc.com
Email: jeff@ramseylawpc.com
Email: joel@ramseylawpc.com
**ATTORNEYS FOR PLAINTIFF**

Jacques G. Balette
MARKS, BALETTE, GEISSEL &
YOUNG, PLLC
State Bar No. 00798004
10000 Memorial Drive, Suite 760
Houston, Texas 77024
Phone: (713) 681-3070
Fax: (713) 681-2811
Email: JacquesB@marksfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served on the below parties in accordance with the Texas Rules of Appellate Procedure 9.5(c) on September 26, 2016 via electronic mail, facsimile and/or certified mail, return receipt requested.

Breck Harrison
Jack Skaggs
Jorge A. Padilla
Jackson Walker, LLP
100 Congress, Suite 1100
Austin, Texas 78701
*Attorney for Appellants*

_____
Jeff Diamant

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Texas Rules of Appellate Procedure 9.4(i) because, exclusive of the matters excepted from the word count limitations of the Rule, this brief contains 8,248 words.

_____
Jeff Diamant

**IN THE COURT OF APPEALS
FOR THE THIRD JUDICIAL DISTRICT OF TEXAS
AT AUSTIN**

OAK CREST MANOR NURSING HOME, LLC, DAY LIFE
CORPORATION, TERRY ROWAN, NORMA ELEMENTO, AND
GROVER MOORE,
Appellants,

v.

PEGGY BARBA, AS GUARDIAN OF S.F.,
Appellee.

On Appeal from the Probate Court,
Travis County, Texas, Cause No. C-1-PB-16-00776

**APPENDIX**

A. Records of Oakcrest Manor Regarding Shawn Frank

B. Affidavit of Peggy Barba

C. Physician's Certificate of Medical Examination (completed by Dr. McRoberts)

D. Affidavit of David E. Mansfield, M.D.

E. Selected Documents from the 1,334-page Texas Medicaid State Plan, Attorney General's Certification

# APPENDIX TAB A

| | | |
|---|---|---|
| Preferred Name: ▮ | Res No.: ▮ | Admit Date: 12/13/13 3:00 pm |
| | Loc: E 6 B | ReAdmitted: |
| | Ph: ▮ | Discharged: |
| | Sex: M | Discharge Status: |
| | | D.O.B.: ▮ |

Admitted From: 02
Readmitted From:
Discharged To:
SSN: ▮

## MEDICAL INFORMATION

Med Record no: ▮
Height: ▮ in.
Admit Weight: ▮ lbs.
Primary Phys: CHUDLEIGH, JAMES     (512) 699-8819
FNP DAVID PFEIFER 512-291-7493
LEANDER, TX 78641
Alternate Phys: PFERIFER, FNP, DAVID     (913) 486-1801
76201 DEER RUN
AUSTIN, TX 78641
Referring Phys:     ( ) -

QL Hospital stay:
From/Thru:
Rehab Potential: GOOD

Allergies:
BACLOFEN ✓

Admit Dx:

Discharge Dx:

Current Dx:
296.52 Bipolar Affec, Depr-Mod
295.40 Ac Schizophrenia-Unspec
561.58 GERD
300.9 Neurotic Disorder Nos
281.0 Pernicious Anemia

Admitted with: ☐ Catheter present ☐ Contractures ☐ Restraint Orders ☐ Pressure Sores (other than Stage 1)
☐ Received pneumococcal vaccine ☐ Received influenza immunization ☐ In facility

## DEMOGRAPHICS

Marital Status: Never married   County: TRAVIS
Race: Caucasian   Primary Lang: English
Religion: N/A   Birthplace: CA
Occupation: DISABLED
☑ U.S. Citizen   ☐ Military Srv.

## BILLING INFORMATION

A/R Type: FV   CMG:   Resources:
Medicare #:   Ancillary A/R Type:
Medicaid #: ▮   Ancillary Co-ins A/R Type:
Ins 1:
Pol:   Grp:
Ins 2:
Pol:   Grp:
Recurring Room Chg:
☑ Adv Bill   ☐ Resident is Self Responsible
TrustFund: ☑ Apply Interest   ☑ Max Balance Reminder

## SERVICE PROVIDERS and PREFERENCES

| Pharmacy | AMERICAN PHARMACEU | (512) 928-8282 |
|---|---|---|
| Dentist | Jackson DDS, David M | (512) 535-5530 |
| Optometrist | Baker O. D., Linda L | (210) 479-7907 |
| Podiatrist | HeralthSync | (836) 436-0351 |
| Psychiatrist | FLOCA, FRANK S | (512) 795-4344 |
| Psychologis | VERICARE | (800) 257-8715 |
| Phys, Occu Ther | SENIOR REHAB SOLUTIC | (888) 210-9758 |
| Speech Therapis | SENIOR REHAB SOLUTIC | (888) 210-9758 |
| Church | NO PREFFERENCE | |
| Hospital | SETON NORTH WEST HC | (512) 324-4455 |
| Ambulance | ACADIAN | (512) 926-5652 |
| Mortuary | AUSTIN-PEEL AND SON | (512) 419-7224 |

Part D Plan:
Effective:   RxBIN:   RxPCN:
Cardholder ID:
Group No:   Issuer:

## RESPONSIBLE PARTY

▮

Relationship: Mother
Phone: (Day) ▮
(Eve)
(Cell)

## SECOND CONTACT

Relationship:
Phone: (Day)
(Eve)
(Cell)

## THIRD CONTACT

Relationship:
Phone: (Day)
(Eve)
(Cell)

## ADDITIONAL INFORMATION

DNR Status          FULL CODE
Advanced Directive  NONE
Nursing Alert       SMOKER
Medicaid ID         ▮
SSN

C▮NTIAL          OCM_Frank 00077

# RESIDENT–DATA COLLECTION

## STATUS UPON ADMISSION

### ADMISSION NOTES

Date of admission _12/13/13_ Time _5:10_ am/pm
nsported by _Van from Shoal Creek_
Accompanied by _Nurse _____
Age _40 yr_ Sex _M_ Weight ____ Height: ____ Ft. ____ In.
Vitals: T____ P____ (☐ Reg ☐ Irreg) R____ B/P____ /____
Attending physician notified of admission? ☑ Yes ☐ No
Date _12/13/13_ Time _4_ am/pm
Diagnosis _Bipolar, Depression, Schizophenia_
Rehab Potential: Good /(Fair)/ Poor
Date of last chest x-ray or PPD____ /____ /____ Results for TB: ☐ Pos. ☐ Neg.

### ALLERGIES

Medication(s) _Lithium, Ativan_
_Loxopine, Colace, Romen_
Food _Reg diet_

Other ____

### SKIN CONDITION

Indicate below all body marks such as old or recent scars (surgical and other), bruises, discolorations, abrasions, pressure ulcers or any questionable markings. Indicate size, depth (in cms), color and drainage.

COMMENTS: ____

### PAIN

(As described by resident/representative)
Frequency:
☑ No pain          ☐ Daily, but not
☐ Less than daily      constant
                    ☐ Constant
Location: ____
Intensity:
☐ No pain          ☐ Severe pain
☐ Mild pain        ☐ Horrible pain
☐ Distressing pain ☐ Excruciating
                      pain
Pain on admission?
☐ No  ☐ Yes, describe____

### IDENTIFY SITE ON DIAGRAM BELOW

Anterior          Posterior

SPECIAL TREATMENTS & PROCEDURES:
____

☐ See Pressure Ulcer Record

## CURRENT STATUS

### GENERAL SKIN CONDITION

Check all that apply:
☑ Reddened ☐ Pale ☐ Jaundiced
   ☐ Cyanotic ☐ Ashen
☐ Dry ☐ Moist ☐ Oily ☑ Warm ☐ Cold
☐ Edema, site____

### PHYSICAL STATUS (describe if applicable otherwise indicate NA)

Paralysis/paresis-site, degree____
Contracture(s)-site, degree____
Congenital anomalies____
Prosthesis: ☐ Glasses ☐ Dentures: ☐ Upper ☐ Lower ☐ Hearing aid
Other____

### FUNCTIONAL STATUS

**TRANSFERS-ABLE TO TRANSFER**
☑ Independently
☐ 1 person assist
☐ 2 person assist
☐ Total assist
**WEIGHT BEARING-ABLE TO BEAR**
☑ Full weight
☐ Partial weight
☐ Non-weight bearing

**AMBULATION-ABLE TO AMBULATE**
☑ Independently
☐ 1 person assist
☐ 2 person assist
☐ With device
   Type____
☐ Wheelchair only
☐ Wheelchair/propels self
☐ Bedrest

**SUPPORTIVE DEVICES USED:**
☐ Elastic hose    ☐ Footboard
☐ Bed cradle      ☐ Air mattress
☐ Sheepskin       ☐ Eggcrate
☐ Hand rolls      ☐ Trapeze
☐ Sling
Traction: Where____
      When____
☐ Other____

### DRUG THERAPY

| # | Drug | Dose/Frequency | # | Drug | Dose/Frequency |
|---|------|----------------|---|------|----------------|
| 1 | Lithium | 900 mg at bed time | 6 | | |
| 2 | Ativan | 1 mg at bed time anxiety | 7 | | |
| 3 | Loxopine | 50 mg bid | 8 | | |
| 4 | Colace | 100 mg daily | 9 | | |
| 5 | Romeron | 30 mg at bed time | 10 | | |

NAME–Last ____
Attending Physician _J. Chudleigh_
Record No. _6A_
Room/Bed _6A_

Form 3275HF © BRIGGS, Des Moines, IA 50306 (800) 247-2343 www.BriggsCorp.com
R1104                    PRINTED IN U.S.A.

**RESIDENT–DATA COLLECTION**
☐ Continued on Reverse

CONFIDENTIAL          OCM_Frank 00093

# OAKCREST MANOR NURSING HOME DISCHARGE SUMMARY

Resident name: ██████ ██ ███████

Record # ██ █

Attending Physician: _DR. CHUDLEIGH_

Admission date: _12/13/13_

Discharge / Death date: _1/15/14_

Admission diagnosis(es):

_Bipolar Affec. Depr - Mod.,_
_Schizophrenia - Unspec._
_GERD_
_Neurotic Disorder NOS_
_Pernicious Anemia_

Disposition: (where resident went & how resident left facility)

_ELOPED —_

Condition on discharge:

_— 0 —_

Discharge diagnosis(es):

_- Same c̄ diagnosis_

Prognosis:

_____   _1/15/14._

Physician's signature          Date

CONFIDENTIAL          OCM_Frank 00076

73 in. 179 wt.   Smoker   Allergy Baclofen

| DATE AND TIME | | NURSE'S NAME |
|---|---|---|
| 12/13/13 | 3am Adm. from Shoal Creek 40 yr old Sch. Long Hx. of Mental illness; Suicide ideation jumped from a bridge in Nov. Has a long Hx. of violence. Reg. Diet, Slow steady gait, Came ē any clothes? Return in Nov. Tested for Hep C — Neg | W/ Male |
| 3-11 | Pt. has been ambulating about the unit all this P.M. ē no depressed discomfort not staying in his room any long until after HS meds were given. | |
| 12/14/13 3-11 | Resident A/O X3, ambulatory ē slow limping gait. Stated (L) foot hurt a little bit per Resident "my foot got fractured about 9 months ago". 2 Tylenol 500mg given @ 8pm for pain (L foot). Resident noted anxious but cooperative, keep pacing ~~continuously~~ continuously around the facility. No behavior problem noted. Resident independent mostly. ADL's ē q, showered himself independently + groomed ē supervision. Smokes ē scheduled time. V/s stable + call light within reach. ——— R.Shutts, LVN | |
| 12/15/13 | [illegible] up o 400 - ambib up + down hallway slow steady gait ē no limp. Pleasant mood. Flat affect Requested # of nothing our child so they can some visit them. # given. ——— [illegible] | |
| 12/16/13 | [illegible] Back + forth ē 5 min asking questions. (When MD here need lax, what of smoke breaks, times of meals - who has lighters,) Did this yesterday. Everything on flyers on wall - showed location of all information. ——— [illegible] | |

| NAME—Last | First | Middle | Attending Physician | Record No. | Room/Bed |
|---|---|---|---|---|---|
| ▮▮▮▮▮ | | | | | |

Form 625P © BRIGGS, Des Moines, IA 50306 (800) 247-2343 www.BriggsCorp.com
R404   PRINTED IN U.S.A.

CONFIDENTIAL       OCM_Frank 00135

| Date | Time | Notes should be signed |
|------|------|------------------------|
| 12/17/13 | 10:45A | First OCM admission for this 40 y/o single male who came to NM from SCM. He has long hx of MI & multiple psych stays. His MI started in xteen years & was worsened by drug use. Res jumped off bridge in 6/12 in SA & that resulted in multiple fx (ankles, spine). Since then he has been in/out of psych hosp & each time "meds are changed" according to mother. She is able to offer only limited support but has reviewed guardianship info. SW also spoke to Tiffany of New Life (payee). Res want to stay for now. He cannot name meds. He presents with flat affect & admits to depression but denies SI or SIB. He denies MI. See back. Long hx of MI. Res serves as own RP. See back ———— |

Last Name: [REDACTED]   First Name: [REDACTED]   Attending Physician:   Room #

NFIDENTIAL          OCM_Frank 00151

10/17/2011 - Progress Notes 1 of 2

Date: 12/17/13  Name: ▓▓▓▓  DO▓▓▓▓  Admission Date: 12/13/13

## Resident Information

### Personal

General appearance: neat, clean, jeans, shirt neat beard
No children

Marital status: ☑ Married (anniversary) _____ ☐ Single ☐ Divorced ☐ Widowed

Primary language: ☑ English ☐ Spanish ☐ Other _____

Race: Caucasian   Religion: No belief

Reason for admission: Res was at SCH - hx of multiple psych admissions + poor stability in community - sent to NH for care of med/psych needs

Diagnoses: Schizoaffective d/o, B-1, GERD, anemia

Resident rights / advanced directives explained to resident / responsible party: ☑ Yes ☐ No

Advanced Directive / Medical Power of Attorney / OOH-DNR: ☑ Yes ☐ No

Medical history: long hx of MI which has impacted his ability to manage his GERD, anemia

Previous living arrangement: Maps home - Shoalcreek - Asg Home

Emotional status: flat effect, quiet speech, denied SI or SIB but stated he was "depressed"

Current mental status: alert, O x2

Behavior problems: reports of suicidal attempts / ideation

Anti-psychotic / Anti-depressant / Anxiety medications: Lithium, Ativan, Loxepine Remeron

Vision: ☑ Good ☐ Average ☐ Poor ☐ Wears / Needs Glasses

Hearing: ☑ Good ☐ Average ☐ Poor ☐ Wears / Needs Hearing Aids

Dental: ☑ Own Teeth ☐ Missing Teeth ☐ Poor Condition ☐ Dentures ☐ None

Please Note How Did Resident React / Cope With Any Physical And / Or Sensory Losses

### Social Background

Where Was Resident Born: Sacremento California (raised)

Environment Of Youth: divorced parents - raised by mother

Family Members / Caregiver Information: mother is only caregiver / provider - No sibs

Education: 8th grade   Employment: Ø - unable to work

legs took drugs acid + left res with poor ability to cont school

Date: _____ Name: _____ DOB: _____ Admission Date: _____

Community Involvement (Clubs, Gov't, Etc.): Ø _____

Military: Ø _____

Interests: Ø _____ Hobbies: T.V. _____

Religion (Active/Passive): Ø — Does Not have belief

Social Habits (Smoking, Drinking, Etc.): drugs - Ø  alcohol - Ø  smoke - Ø

Any History Of Psychiatric Problems: began using drug in teen years + has [long] 25(+) - yr hx of MI  has multiple Psych stays

Who Are The Significant Others/In The Resident's Life: mother + New Life Outreach (payee)

Are The Significant Others Supportive: yes   If Supportive, Explain How: call visit

Resident's Attitude Toward Illness / Placement: accepting for now

Family Or Significant Other's Attitude Toward Illness / Placement: mother is relieved but concerned about future

### Discharge Plan

Resident's Plan For Stay In Facility: wants to stay for now

Family / Significant Other's Plan For Stay Or Discharge: wants res to stay

Please Note From Whom The Material Was Gathered For The Social History: Res - mother - chart
New Life Outreach - Tiffany - 512-293-1527

Name of Resident                                    Admission Number

Name and Title                                       Date

# APPENDIX TAB B

State of Texas           §
                         §
                         §
Hays County              §

## AFFIDAVIT OF PEGGY BARBA

Before me, the undersigned authority, did personally appear the affiant Peggy Barba, who upon being by me duly sworn, upon oath states the following:

"My name is Peggy Barba. I am over 18 years of age and competent to provide this affidavit.

I am the mother of Shawn Frank. Shawn has had a history of mental illness since at least 16 years old. He was diagnosed with schizophrenia and bipolar disorder at least 15-20 years ago, to the best of my recollection. His diagnosis has continued through today. Shawn was a schizophrenic and bipolar on the date of his admission to Oakcrest Manor.

While Shawn was admitted to Shoal Creek Hospital, prior to his admission to Oakcrest Manor, I received a call from a female case manager who informed me that Shawn could not stay any longer at Shoal Creek Hospital and had to be transferred to Oakcrest Manor. I was not given any decision or choice in this matter, I was simply informed of the impending transfer by the case manager. I was not Shawn's legal guardian at the time as he was an adult at that time. Shawn was mentally incapacitated at the time and on the date of his admission to Oakcrest Manor, and had been for many years prior.

Neither I nor any legal guardian for Shawn was present when he was admitted to Oakcrest Manor and I was never informed that he had been required to sign any paperwork, nor was I ever provided a copy of any such paperwork. As his mother, and based on his mental diagnosis for many years, Shawn would not have had capacity to understand any such paperwork or agreement on December 13, 2014.

Approximately 1 week or less after his admission to Oakcrest Manor, I went to visit my son. I was unhappy with his conditions and concerned for his safety. So I immediately began finding out how to apply for legal guardianship of Shawn, which I filed shortly thereafter.

I received a call from Shawn warning me that he was planning on eloping from Oakcrest Manor and had intent to jump off a bridge about a day or so prior

to him jumping off the bridge that caused the injuries in this case. I immediately called the Oakcrest Manor administrator and informed him of Shawn's call and intent. He simply told me that Shawn was fine and getting his haircut and that I had no reason to worry. I re-urged my request for them to watch Shawn carefully, which was apparently disregarded. In fact, I called the administrator twice with this same warning and urging him to watch Shawn carefully. Then Shawn eloped from Oakcrest Manor and jumped from a bridge. To my knowledge, Oakcrest did not even know he was gone until about 9-10:00am the next morning. In my call(s) with the administrator of Oakcrest Manor, I reminded him that Shawn is suicidal and has a history of elopement and trying to hurt himself.

Affiant Further Sayeth Not,

_Peggy Barba_____
Peggy Barba, Affiant


This instrument was acknowledged before me on the __7__ day of July 2016.


MICHAEL PETER PAUZER
My Commission Expires
April 25, 2017

Notary Public, State of Texas

# APPENDIX TAB C

In the Matter of the Guardianship of

_____

an Alleged Incapacitated Person

For Court Use Only

Court Assigned:_____

## To the Physician

*The purpose of this form is to enable the Court to determine whether the individual identified above is incapacitated according to the legal definition (set out on page 4), and whether a guardian should be appointed to care for that person.*

### 1. General Information

Physician's Name _Dr. Roger Lowry McRoberts_    Phone: (512) 324-7000

Office Address _601 E 15th_

_Austin, TX 78701_

☑ YES ☐ NO—I am a physician currently licensed to practice in the State of Texas.

Proposed Ward's Name _███ Frank_

Date of Birth ████████    Age ██    Gender ☑ M ☐ F

Proposed Ward's Current Residence: _was @ Oak Crest Manor but will not return_

I last examined the Proposed Ward on ____ 1/30 ____, 20 14

at ☑ a Medical facility  ☐ the Proposed Ward's residence  ☐ Other: _____

☑ YES ☐ NO—The Proposed Ward is under my continuing treatment.

☑ YES ☐ NO—Before the examination, I informed the Proposed Ward that communications with me would not be privileged.

☐ YES ☑ NO—A mini-mental status exam was given. If "YES," please attach a copy.

### 2. Evaluation of the Proposed Ward's Physical Condition

Physical Diagnosis: _Orthopedic injuries following jump off bridge_

a. Severity: ☐ Mild  ☐ Moderate  ☑ Severe

b. Prognosis: _Guarded_

c. Treatment/Medical History: _Multiple surgeries and external fixators_

### 3. Evaluation of the Proposed Ward's Mental Function

Mental Diagnosis: _Schizophrenia_

a. Severity: ☐ Mild  ☐ Moderate  ☑ Severe

b. Prognosis: _Poor_

c. Treatment/Medical History: _Multiple trials of antipsychotics_

If the mental diagnosis includes dementia, answer the following:

☐ YES ☑ NO — It would be in the Proposed Ward's best interest to be placed in a secured facility for the elderly or a secured nursing facility that specializes in the care and treatment of people with dementia.

☐ YES ☑ NO — It would be in the Proposed Ward's best interest to be administered medications appropriate for the care and treatment of dementia.

☐ YES ☑ NO — The Proposed Ward currently has sufficient capacity to give informed consent to the administration of dementia medications.

4. **Cognitive Deficits**

   a. The Proposed Ward is oriented to the following (check all that apply):

   ☑ Person    ☑ Time    ☑ Place    ☐ Situation

   b. The Proposed Ward has a deficit in the following areas (check all areas in which Proposed Ward has a deficit):

   ☐— Short-term memory

   ☐— Long-term memory

   ☐— Immediate recall

   ☐— Understanding and communicating (verbally or otherwise)

   ☐— Recognizing familiar objects and persons

   ☐— Performing simple calculations

   ☐— Reasoning logically

   ☑— Grasping abstract aspects of his or her situation

   ☑— Interpreting idiomatic expressions or proverbs

   ☑— Breaking down complex tasks down into simple steps and carrying them out

   c. ☐ YES   ☑ NO— The Proposed Ward's periods of impairment from the deficits indicated above (if any) vary substantially in frequency, severity, or duration.

5. **Ability to Make Responsible Decisions**

   Is the Proposed Ward able to initiate and make responsible decisions concerning himself or herself regarding the following:

   ☐ YES   ☑ NO —— Make complex business, managerial, and financial decisions

   ☐ YES   ☑ NO —— Manage a personal bank account

       If "YES," should amount deposited in any such bank account be limited?   ☐ YES   ☐ NO

   ☐ YES   ☑ NO —— Safely operate a motor vehicle

   ☐ YES   ☑ NO —— Vote in a public election

   ☐ YES   ☑ NO —— Make decisions regarding marriage

   ☐ YES   ☑ NO —— Determine the Proposed Ward's own residence

   ☐ YES   ☑ NO —— Administer own medications on a daily basis

   ☑ YES   ☐ NO —— Attend to basic activities of daily living (ADLs) (e.g., bathing, grooming, dressing, walking, toileting)

   ☐ YES   ☑ NO —— Attend to instrumental activities of daily living (e.g., shopping, cooking, traveling, cleaning)

   ☐ YES   ☑ NO —— Consent to medical and dental treatment at this point going forward

   ☐ YES   ☑ NO —— Consent to psychological and psychiatric treatment at this point going forward

6. **Developmental Disability**

   ☐ YES   ☑ NO —— Does the Proposed Ward have developmental disability?

   If "NO," skip to number 7 on page 4.
   If "YES," answer the following question and look at the next page.
   Is the disability a result of the following? (Check all that apply)

   ☐ YES   ☐ NO —— Intellectual Disability?

   ☐ YES   ☐ NO —— Autism?

   ☐ YES   ☐ NO —— Static Encephalopathy?

   ☐ YES   ☐ NO —— Cerebral Palsy?

   ☐ YES   ☐ NO —— Down Syndrome?

   ☐ YES   ☐ NO —— Other? Please explain _____

## Developmental Disability, continued

Please answer the questions in the box below only if both of the following are true:

(1) The basis of a proposed ward's alleged incapacity is intellectual disability.

**and**

(2) **You are making a "Determination of Intellectual Disability"** in accordance with rules of the executive commissioner of the Health and Human Services Commission governing examinations of that kind.

If you are not making such a determination, please skip to number 7 on the next page.

---

**"DETERMINATION OF INTELLECTUAL DISABILITY"**

Among other requirements, a Determination of Intellectual Disability must be based on an interview with the Proposed Ward and on a professional assessment that includes the following:

1) a measure of the Proposed Ward's intellectual functioning;

2) a determination of the Proposed Ward's adaptive behavior level; and

3) evidence of origination during the Proposed Ward's developmental period.

*As a physician, you may use a previous assessment, social history, or relevant record from a school district, another physician, a psychologist, a public agency, or a private agency if you determine that the previous assessment, social history, or record is valid.*

1. Check the appropriate statement below. If neither statement is true, skip to number 7 on the next page.

   ☐ **I examined the proposed ward in accordance with rules of the executive commissioner of the Health and Human Services Commission governing intellectual Disability examinations,** and my written findings and recommendations include a determination of an intellectual disability.

   ☐ **I am updating or endorsing in writing a prior determination of an intellectual disability** for the proposed ward made in accordance with rules of the executive commissioner of the Health and Human Services Commission by a physician or psychologist licensed in this state or certified by the Department of Aging and Disability Services to perform the examination.

2. What is your assessment of the Proposed Ward's level of intellectual functioning and adaptive behavior?

   ☐ Mild (IQ of 50-55 to approx. 70)          ☐ Moderate (IQ of 35-40 to 50-55)

   ☐ Severe (IQ of 20-25 to 35-40)             ☐ Profound (IQ below 20-25)

3. ☐ Yes   ☐ No---- Is there evidence that the intellectual disability originated during the Proposed Ward's developmental period?

---

*Note to attorneys: If the above box is filled out because a determination of intellectual disability has been made in accordance with rules of the executive commissioner of the Health and Human Services Commission governing examinations of that kind, a Court may grant a guardianship application if (1) the examination is made not earlier than 24 months before the date of the hearing or (2) a prior determination of an intellectual disability was updated or endorsed in writing not earlier than 24 months before the hearing date. If a physician's diagnosis of intellectual disability is not made in accordance with rules of the executive commissioner — and the above box is not filled out — the court may grant a guardianship application only if the Physician's Certificate of Medical Examination is based on an examination the physician performed within 120 days of the date the application for guardianship was filed. See Texas Estates Code § 1101.104(1).*

7. **Definition of Incapacity**

For purposes of this certificate of medical examination, the following definition of incapacity applies:

> An "Incapacitated Person" is an adult who, because of a physical or mental condition, is substantially unable to: (a) provide food, clothing, or shelter for himself or herself; (b) care for the person's own physical health; or (c) manage the person's own financial affairs. Texas Estates Code § 1002.017.

8. **Evaluation of Capacity**

    ☑ YES  ☐ NO ---- Based upon my last examination and observations of the Proposed Ward, it is my opinion that the Proposed Ward is incapacitated according to the legal definition in section 1002.017 of the Texas Estates Code, set out in the box above.

    If you indicated that the Proposed Ward is incapacitated, indicate the level of incapacity:

    ☑ Total ------------The Proposed Ward is totally without capacity (1) to care for himself or herself and (2) to manage his or her property.

    ☐ Partial -----------The Proposed Ward lacks the capacity to do some, but not all, of the tasks necessary to care for himself or herself or to manage his or her property.

    If you answered "NO" to <u>all</u> of the questions regarding decision-making in Section 5 (on page 2) and yet still believe the Proposed Ward is <u>partially</u> incapacitated, please explain: _____

    _____

    If you answered "YES" to <u>any</u> of the questions regarding decision-making in Section 5 (on page 2) and yet still believe the Proposed Ward is <u>totally</u> incapacitated, please explain: _Able  to  provide_

    _some  ADL's_____

9. **Ability to Attend Court Hearing**

    ☐ YES  ☑ NO ----The Proposed Ward would be able to attend, understand, and participate in the hearing.

    ☑ YES  ☐ NO ----Because of the Proposed Ward's incapacities, I recommend that the Proposed Ward <u>not</u> appear at a Court hearing.

    ☑ YES  ☐ NO ----Does any current medication taken by the Proposed Ward affect the demeanor of the Proposed Ward or his or her ability to participate fully in a court proceeding?

10. **What is the least restrictive placement that you consider is appropriate for the Proposed Ward:**

    ☑---- Nursing home level of care

    ☐--- Memory care unit

    ☑--- Other__Psychiatric  Facility_____

11. **Additional Information of Benefit to the Court:** If you have additional information concerning the Proposed Ward that you believe the Court should be aware of or other concerns about the Proposed Ward that are not included above, please explain on an additional page.

_____            __1/30/14_____
Physician's Signature                                    Date

__Roger Lowell McRoberts__                __M 6761_____
Physician's Name Printed                                 License Number

PAGE 4 OF 4

# APPENDIX TAB D

State of New Mexico                          §
                                             §
Lincoln County                               §

## AFFIDAVIT OF DAVID E. MANSFIELD, M.D.

Before me, the undersigned authority, did personally appear the affiant David E. Mansfield, M.D., who upon being by me duly sworn, upon oath states the following:

"My name is David E. Mansfield, M.D., I am over 18 years of age and competent to provide this affidavit.

I am a Medical Doctor who is Board Certified in Family Practice and Wound Care. I have extensive experience in these areas, as well as extensive experience in nursing home/skilled nursing facility protocols, procedures, and patient care. I have worked with patients and residents of all types, including many patients with significant mental illnesses.  A copy of my Curriculum Vitae is attached hereto as Exhibit A, and incorporated herein by reference.

I am familiar with the facts and circumstances made the basis of Shawn Frank's claims against Oak Crest Manor, et al.  I have reviewed the records of:

1) Oakcrest Manor Nursing Home
2) Seton Shoal Creek Hospital
3) University Medical Center Brackenridge

To reach my opinion herein, I relied on my knowledge gained from over 40 years of practicing medicine as well as my continuing research, regular practice of keeping up-to-date on relevant medical knowledge and developments; any relevant medical texts, and the records of Plaintiff Shawn Frank, as noted above.

Shawn Frank is a diagnosed schizophrenic, bipolar and depressive person. Schizophrenia is a serious disorder which affects how a person thinks, feels and acts. Someone with schizophrenia, particularly in Shawn Frank's case, would have difficulty distinguishing between what is real and what is imaginary. Specifically, Shawn Frank has schizoaffective disorder, in which a person has symptoms of both schizophrenia and a major mood

disorder such as depression.  In this case, he is also bipolar and depressive. The result of this is manifested in Shawn Frank as a person who likely cannot distinguish what is real and what is false, may have delusions, hallucinations and/or disordered thinking as well as depression and suicidal tendencies. Persons with Shawn Frank's conditions can even appear lucid, responsive and as if they have full capacity when, in fact, they do not.

As such, it is my opinion, to a reasonable degree of medical probability, based on Shawn Frank's condition, he would lack sufficient capacity to contract and would require a guardian. It is further my opinion that, to a reasonable degree of medical probability, Shawn Frank was totally incapacitated on December 13, 2013, the day he was admitted to Oakcrest Manor, as he was prior to his admission, and as he continues to be.

Affiant Further Sayeth Not,


_____

David E. Mansfield, M.D., Affiant


This instrument was acknowledged before me on the ___8th___ day of July 2016.


_____

Notary Public, State of ~~Texas~~ New Mexico

County of Lincoln


**OFFICIAL SEAL**
Cindy L. Oakes
NOTARY PUBLIC-State of New Mexico
My Commission Expires February 26, 2018

# APPENDIX TAB E

STATE PLAN UNDER TITLE XIX OF THE SOCIAL SECURITY ACT
MEDICAL ASSISTANCE PROGRAM

State of Texas

ATTORNEY GENERAL'S CERTIFICATION

I certify that:

Health and Human Services Commission is the single state agency responsible for:

☒ Administering the plan.

The legal authority under which the agency administers the plan on a statewide basis is:

Texas Government Code, Section 531.021(b)
(statutory citation)

☐ Supervising the administration of the plan by local political subdivisions.

The legal authority under which the agency supervises the administration of the plan on a Statewide basis is contained in

_____
(statutory citation)

The agency's legal authority to make rules and regulations that are binding on the political subdivision administering the plan is:

_____
(statutory citation)

_____
Date

State: Texas
Date Received: 11 December, 2015
Date Approved: 8 January 2016
Date Effective: 1 October, 2015
Transmittal Number: TX 15-0035

Chip Roy_____
Printed Name

_____
Signature

First Assistant Attorney General____
Title

TN: ___15-0035___   Approval Date: ___1/08/16___   Effective Date: ___10/01/15___

Supersedes TN: ___13-0057MM4___

## STATE PLAN UNDER TITLE XIX OF THE SOCIAL SECURITY ACT
## MEDICAL ASSISTANCE PROGRAM

### State of Texas

## ORGANIZATION AND FUNCTIONS OF THE STATE AGENCY AND THE ORGANIZATION CHART OF THE AGENCY

The Health and Human Services Commission (HHSC) is the state agency with primary responsibility for overseeing the delivery of state health and human services. HHSC is governed by the Executive Commissioner of Health and Human Services, who is appointed by the Governor of the State of Texas.

Per H.B. 2292, 78th Legislature, Regular Session, 2003, the various health and human services agencies were reorganized into four new departments and placed under the authority of HHSC. These departments include the Department of State Health Services (DSHS), the Department of Aging and Disability Services (DADS), the Department of Assistive and Rehabilitative Services (DARS), and the Department of Family and Protective Services (DFPS). HHSC is directed by state law to oversee the operations of these four operating departments.

Section 531.021 of the Texas Government Code designates HHSC as the single state agency for administering federal medical assistance funds. Under this authority, the federal medical assistance funds are granted to HHSC by the Centers for Medicare & Medicaid Services (CMS). As the single state agency, HHSC has final authority over the Medicaid programs that are administered by HHSC or carried out by the other operating departments subject to the approval of HHSC. Within HHSC, the State Medicaid Director administers the Medicaid program.

HHSC's Medicaid responsibilities as the single state agency include:

- Primary point of contact with CMS;
- Administration of the state plan;
- Determination of Medicaid eligibility;
- Policy development and rule-making;
- System planning and evaluation;
- Determination of fees, charges, and rates;
- Management of federal funds;
- Prevention and detection of fraud and abuse; and
- Administration of the Medical Care Advisory Committee (MCAC) mandated by federal Medicaid law. The MCAC reviews and makes recommendations to the State Medicaid Director on proposed Medicaid rules.

STATE _____ Texas _____
DATE REC'D _____ 3-30-12 _____
DATE APPV'D _____ 4-26-12 _____    A
DATE EFF _____ 3-1-12 _____
HCFA 179 _____ 12-01 _____

SUPERSEDES: TN- _____ 01-15 _____

STATE _Texas_
DATE REC'D _3-30-12_
DATE APPV'D _4-26-12_  A
DATE EFF _3-1-12_
HCFA 179 _12-01_

# TEXAS MEDICAID OPERATING DEPARTMENTS

